[No. C018820. Third Dist. June 27, 1995.]

In re ELIZABETH R. et al., Persons Coming Under the Juvenile Court Law.
SHASTA COUNTY DEPARTMENT OF SOCIAL SERVICES, Plaintiff and Respondent, v.
REBECCA R., Defendant and Appellant.

## COUNSEL

Ann Jory, under appointment by the Court of Appeal, for Defendant and Appellant.

Karen Keating Jahr, County Counsel, and Michael A. Ralston, Assistant County Counsel, for Plaintiff and Respondent.

## OPINION

**RAYE, J.**—In this case we are called upon to consider the authority of the juvenile court to extend the time parameters ordinarily applicable to dependency proceedings in an unusual circumstance where a parent's hospitalization for mental illness compromises her ability to participate in reunification services. The mother, Rebecca, was hospitalized for all but five months of the reunification phase of the dependency proceedings. At the 18-month status review hearing the juvenile court ordered family reunification services terminated and the case set for a selection and implementation hearing, despite evidence of the mother's impeccable record of visitation and efforts

to comply with the reunification plan. The order was premised on the court's erroneous belief that it could not extend the reunification period and was compelled to either terminate reunification services or return the minor children to the mother. We will reverse the judgment terminating the mother's parental rights and remand to permit the trial court to exercise its discretion under Welfare and Institutions Code section 352 to continue reunification services.

FACTUAL AND PROCEDURAL BACKGROUND

As so often occurs in dependency appeals, we are required to piece together the critical facts from years of reports, plans, and evaluations, prepared by a revolving cast of social workers, therapists, and psychiatrists, argued by a revolving cast of lawyers, and reviewed by a revolving cast of judges. Because they are so critical to our disposition of this appeal, we recount the facts in detail.

Rebecca, the youngest of six children, was the "product of a very pathological family system." Her father was abusive. In her midteens, Rebecca was diagnosed with bipolar disorder and thereafter was treated by numerous psychiatrists, placed on a variety of psychotropic medications, and was hospitalized often. She is extraordinarily intelligent, with an IQ of 134.

In 1986 Rebecca, while hospitalized, met Eugene, who had also been hospitalized for depression, and began a relationship with him. She was 23 years old. They left the hospital and began driving cross-country seeking shelter. Thus began an unstable relationship which over the next five years saw Rebecca give birth to the three children who are the subject of this proceeding.

Unable to take her medication during pregnancy, Rebecca suffered a postpartum psychotic episode soon after each of her daughters was born. Within a week of Elizabeth's birth in 1988, Rebecca fled the house with her newborn, exhibiting manic behavior. She was hospitalized involuntarily and Elizabeth was placed in a temporary shelter. Eugene, who was employed as a mechanic, threatened the hospital staff and the social worker.

Cassie was born on November 8, 1989. Again, within two weeks of the birth, Rebecca suffered another psychotic episode, was hospitalized, and the girls were placed in a shelter. Eugene and Rebecca regained custody but continued their nomadic life-style. During the next three years they were evicted from every home or apartment they had lived in. Aurora was born on December 13, 1991, during a move to Redding. After the birth, Rebecca

checked in with the mental health department but was assured she appeared fine. She was told to return if she had any problems.

She did have problems. Before Aurora was a month old, Eugene, who had contracted hepatitis, left Rebecca by herself with their preschooler, toddler and newborn to attend a demonstration. By then Rebecca also had hepatitis. On January 10, 1992, she accidentally left dinner on the stove as she visited with a neighbor. She called the fire department when she returned to find smoke filling the apartment and Cassie asleep on the floor. She removed all three children from the apartment. Showing signs of another psychotic episode, Rebecca was admitted to Shasta County Mental Health at her request. The children were taken into protective custody and placed in a foster home. Two days later, she was involuntarily committed and a dependency petition was filed. (Welf. & Inst. Code, § 300, subd. (b), failure to protect.) The petition alleged Rebecca suffered a mental illness and the whereabouts of the children's father was unknown. Neither Rebecca nor Eugene was present at the detention or jurisdictional hearings, though they were each represented by counsel.

At the end of February, Rebecca was moved to a locked board and care facility in Fremont and a temporary conservatorship was established. A reunification plan was prepared in March. Rebecca was required to visit the children weekly, learn nurturing skills, take a parenting class, demonstrate parenting abilities, notify the social worker when released or thereafter when changing her living arrangements, contact the social worker bimonthly, establish a stable living arrangement for six months, obtain counseling, participate in support groups, take medications, and sign releases. Rebecca was assigned a new social worker, Wanda Lamb.

The department asserts Rebecca was shown the reunification plan in June but it was not signed. Rebecca testified the plan was presented to her for the first time in August.

Nevertheless, Rebecca had complied with nearly all the terms of the reunification plan by the six-month status review hearing in September. She maintained contact with Lamb, had regular visits with the girls once she was released from the hospital, was taking her medication and working closely with the mental health department, was involved in an independent living skills program, and had begun a parenting class.

She was given an amended reunification plan in September requiring her to submit to a psychological examination and to keep Eugene out of the house unless and until he completed his plan and was authorized by the

department to return. The other terms remained essentially the same as the original plan.

Rebecca continued to work hard to regain custody of her children through the fall of 1992 by complying with the reunification plan. In September she rented an apartment. Visitation was gradually increased to six hours per week and progressed from completely supervised visits at the department's office to semisupervised visits at Rebecca's apartment. The girls were happy to see their parents and they all exchanged hugs freely.

Rebecca's psychological evaluation was performed in November. Described as mentally gifted, Rebecca's thinking was clear and lucid and her expressive and receptive language skills were quite good. The psychologist opined she possessed good potential to become a relatively normal parenting figure because of her excellent intellectual resources and her general levels of social awareness and perceptiveness. Nevertheless, he believed she would require long term psychotherapy, consistent use of medications, and probably separation from Eugene to maintain stabilization. He foresaw the children eventually returned to her care and custody.

Rebecca suffered considerable stress through the holidays. She was very upset she was not allowed a visit with the girls on either Thanksgiving or Christmas. She was struggling to resolve the dilemma imposed by the department to give up either her husband or her children.

By January Rebecca recognized signs of an impending manic episode. On January 11, 1993, she sought help and voluntarily admitted herself into the hospital. Lamb reported that Rebecca had substantially complied with the reunification plan prior to her hospitalization. She completed parenting classes, maintained an apartment, had a psychological evaluation, and maintained regular visitation with the children, at which time she demonstrated appropriate parenting skills. Lamb had two ongoing concerns: Rebecca's failure to complete counseling and the presence of Eugene in the home.

Just after Rebecca was hospitalized, Lamb transferred the case to Patricia Maestas and the course of the reunification phase changed abruptly. Within a month, Maestas recommended the termination of reunification services and the setting of a selection and implementation hearing. (Welf. & Inst. Code, § 366.26.) In her 12-month status review report written in February, Maestas also acknowledged substantial compliance with the reunification plan. She wrote that Rebecca and Eugene put a good deal of thought into activities with the girls during their visits, the girls were happy to see their parents, and they all exchanged hugs freely. She was concerned about Rebecca's

reluctance to follow through on counseling, however, and her poor history of staying on a medication regimen.

In March 1993 Rebecca was admitted to Merced Manor, a locked facility, where she participated in five hours of therapy a day, seven days a week. She remained under conservatorship.

At the 12-month status review hearing in April, Maestas testified she had not discussed the counseling component of the reunification plan with Rebecca and she did not know there was an element of the reunification plan requiring Eugene to be out of the house. She did not observe any problems with Eugene's interaction with the girls during visits, nor did she observe Eugene affect Rebecca adversely.

The court found Rebecca's emotional and mental stability to have been inconsistent during the previous six months; Eugene did not adequately supervise; and both Rebecca and Eugene did not understand how their mental health affected their ability to parent. Nevertheless, the court found there was a substantial probability the children would be returned home within six months, and therefore, reunification services were continued for an additional six months. The department was ordered to continue the existing visitation.

Rebecca asked for visitation, but was told the hospital was too far. Maestas wrote her 18-month status report in July and once again recommended termination of services and a selection and implementation hearing scheduled. She also asked the court to terminate all visits, although an end to visitation had already been unofficially accomplished; Rebecca had been allowed only 1 visit since January, and that was at the time of the 12-month status review hearing in April. The Maestas report is almost verbatim from the report she had written five months earlier, but with one major exception. In this report, and for the first time, she reports that Elizabeth, who was then five, had difficulty transitioning from her parents to her foster parents and her behavior had become more aggressive. She was then receiving therapy. She explained that Cassie, then three and one-half, and Aurora, then one and one-half, adjusted well to their placement. She stated that the foster parents wanted to adopt the children.

Reunification was unraveling. Rebecca was released from the hospital on August 3, 1993. She immediately contacted Maestas and arranged a visit the following day. Her conservatorship was rescinded. During their first visit in months, Elizabeth and Cassie referred to Aurora as "Brandy." Rebecca was upset the foster parents had changed her daughter's name. She was admonished to handle the visits appropriately. She then left for Florida to arrange a more permanent and stable living situation for the children near her family.

She visited again as soon as she returned, bringing crayons and sidewalk chalk. Maestas reported, "It was a nice meeting. The girls seemed very comfortable."

At the 18-month status review hearing, Rebecca testified she was on lithium to control her bipolar disorder, she planned to stay in therapy, she received Social Security and had been made her own payee, and she wanted to move to either Florida or Maryland to have the support of her father and siblings. Maestas testified Rebecca demonstrated a very good level of parenting ability. She admitted she was unaware of the intensive counseling Rebecca had received at Merced Manor.

Judges, social workers, and attorneys change often in dependency proceedings.[1] The same judge presided at the detention, jurisdictional, and dispositional hearings. By the six-month review, he expressly recognized the progress Rebecca had made. A different judge conducted the 12-month review and a third, Judge William Curle, presided over the 18-month review in September, 1993.

Judge Curle, however, had observed Rebecca in several earlier conservatorship proceedings. His remarks are poignant. He observed that Maestas's report was written when Rebecca was hospitalized and there was no indication conservatorship would be terminated. Obviously troubled, he remarked, "[T]hings have changed considerably in the last five weeks. . . . [¶] [Y]ou've written the report, but hey, the whole world has changed in these people's lives since that report was authored." He criticized the disparity between the written recommendation to discontinue visitation and Maestas's testimony visitation should be allowed. He observed the tremendous work Rebecca had done in Merced.

The lawyers for Rebecca and Eugene both urged the court to return custody of the children with conditions to protect the children. The department insisted upon termination of services and the scheduling of a selection and implementation hearing. The attorney for the minors, although unwilling to agree to return the children, was bothered by the department's rush toward adoption. He stated: "The problem I have with this case is that the Department is indicating an anticipated recommendation of an adoption. [¶] For

---

[1] This case illustrates the adverse effects of such discontinuities and the wisdom of recent recommendations by a court policy planning body that "[w]henever possible, a single case worker should be assigned to work with each troubled family throughout the course of court intervention." (Report of the Commission on the Future of the California Courts, Justice in the Balance, ch. 7, Recommendation 7.4, p. 123.) Equally important is the assignment of a dependency case to a single judge wherever possible. "Only a judge who is witness to the continuum of such events can fully comprehend the scope and pattern of family collapse." (*Id.* at p. 130.)

some reason, that's not sitting very well with me right now. . . . [¶] The Code indicates if there's a benefit to be derived from continuing contact between the parents and the children, then adoption should not be the mode or the avenue we take. . . . [¶] I think there's something that's telling me there's a possibility this can turn around for these folks."

The court was on the horns of a dilemma. It was impressed with Rebecca's progress and optimistic about her ability to sustain her mental health. Yet the department insisted the court had no discretion to accommodate the changed circumstances. Counsel for the department admonished the court, "We're at the point legally where a return of these children would have to be made to these parents or services will have to be terminated. That's the point we're at." The court responded, "You're asking for one or the other, period." Counsel admitted, "That's correct."

Judge Curle, frustrated by the department's insistence he had only two choices, A and B, explained, "I'm saying wait a minute. If there's some point where something has changed enough, then I get a Column C here, logically. I get a Column C if your statement—what does it take me to get a Column C?"

Rebecca's attorney argued that column C encompassed returning the children under court supervision. But the minors' attorney disagreed. He, like the department, believed time had run out. He suggested the parents bring a subsequent motion for modification. (Welf. & Inst. Code, § 388.)

The court adopted the minors' attorney's reasoning. "I like the kids where they are right now. . . . [¶] The good part is that as [c]ounsel is very well aware of, I have had the opportunity to see . . . [Rebecca] back in April and August. She is a different woman. I mean an entirely different woman. She has made amazing steps from the conservatorship from Merced." It ordered a long assessment period and liberal visitation in a controlled atmosphere.

Reunification services were terminated. The case therefore was on a very different track. Contrary to the spirit of the 18-month hearing during which both the court and minors' counsel remained optimistic about Rebecca's ability to parent her children, the department once again attempted to limit visitation. The court rejected the department's request and ordered bimonthly visitation.

After the hearing, Rebecca continued to comply with the terms of the amended reunification plan and to demonstrate the stability of her recovery. In October she began attending services at the Trinity United Methodist

Church and continued her persistent attempts to visit her children. Nevertheless, the department or the foster parents canceled four visits at the last minute in October alone. She was terribly disappointed because the visits were often canceled after she had prepared special treats or activities for the children. Worse yet, the department refused to allow her to make up the canceled visits. In the meantime, she met with therapists for 12 clinical hours. She disclosed to the therapists she believed the department intended to seek adoption from the outset. She also admitted she was very upset the foster mother had renamed her daughter.

Rebecca filed a motion pursuant to Welfare and Institutions Code section 388 to modify the earlier order due to a change of circumstances. She alleged the following changes: she had been released from conservatorship, she had attended regular counseling sessions, she was taking her medication as prescribed, she had been made her own payee for Social Security, she had regular visits with her children, and she had secured housing and was paying her own rent.

Her therapists reported she needed long-term therapy and monitoring. They were concerned because she failed to recognize the impact of her mental illness upon the children.

In late November 1993 the department again requested the court to reduce visitation. According to the department's report, the children's behavior changed dramatically. Cassie was extremely aggressive and Aurora was hesitant to interact with Eugene and Rebecca; Eugene and Rebecca were seen following the foster parents' car and Rebecca called Elizabeth's school.

Rebecca requested a visit on Aurora's second birthday in December, but the request was denied. Nor was she allowed to see the girls on Christmas. She was forced to consolidate a birthday and Christmas visit and during this visit the adoption worker appeared unannounced to assess the strength of the attachment, if any, between the girls and their parents. Elizabeth brought a bookbag to the visit with the initials of her foster family. Eugene was very upset.

In December, although Rebecca had continued therapy once or twice a week, Maestas recommended termination of parental rights to facilitate adoption. In her report and recommendation for the selection and implementation hearing, she juxtaposed Rebecca's hospitalizations with the merits of the foster placement. She statistically summarized Rebecca's contact with the children writing: "From the Dispositional hearing to 18-month Review hearing, there were 117 visits available; 40 visits occurred. From January

1993 to August 1993, a total of four visits took place. Rebecca was conserved and living out of County during this time period." Maestas reported the children had a positive relationship with their foster parents whom they referred to as "Mama and Daddy." The foster parents, both high school graduates, had adopted four other children under the age of twelve.

In January 1994 the department recommended a suspension of visitation. In a supplemental report, Maestas wrote that Rebecca had inappropriately told her children not to call her foster parents "Mommy" and "Daddy." She also reported a series of threats made by Eugene.

Again, the cast changed dramatically. Although all the parties petitioned to have Judge Curle finish the case, the selection and implementation hearing was set before a different judge. The lawyers changed as well. Eugene's counsel was relieved and he proceeded in propria persona. Rebecca, with her father's financial help, hired private counsel and filed for divorce from Eugene.

In the months preceding the Welfare and Institutions Code section 366.26 hearing, Rebecca continued to visit the girls as much as she was allowed and to obtain further medical, spiritual and community support. She baked chocolate cupcakes for the girls for Valentine's Day. In February, her doctor discontinued her lithium. She began attending a manic/depressive support group. On one occasion, she was seen driving by the foster parents' house.

Undaunted by the string of unsuccessful attempts to limit or eliminate Rebecca's visitation, the department tried again. In March the court denied the department's application for a restraining order preventing Rebecca from visiting with the children. She was ordered, however, not to divulge the time or location of the visits to Eugene. She was denied her request for additional visitation, including an Easter visit.

Rebecca filed an amended petition pursuant to Welfare and Institutions Code section 388 and by declaration alleged the following additional facts: she was under medical supervision; she had joined additional support groups; she sought employment; she had distanced herself from Eugene and made new friends on her own; she substantially reduced her debt; she secured stable housing; and she attended every visit allowed by the department. She stated that between September 1, 1993, and March 22, 1993, she was only allowed seven or eight of seventeen ordered visits.

Enter another new jurist who candidly remarked, "I have not had as much involvement in this case, as the case has been in the system a long time. I've only come into it since January . . . ."

Rebecca had retained new counsel as well. He asked her a series of questions eliciting long narrative responses describing her entire medical history and the minutia involved in all previous proceedings. Expressing obvious frustration, the court stated: "I'm really puzzled, Mr. Farrell [mother's counsel], as to what we're doing. I confess to you that I have not . . . had a whole lot of these types of hearings, but I . . . understand the issues. They are pretty narrow at this point. And I have to convey to you that I am —I'll just be blunt. I don't think that what you're doing is of benefit to your client's best interest. I—if I understand the issues, I'm to look at whether or not it's the children's best interest now. . . . [¶] [T]he fact that [Rebecca] has had a history of problems with mental health in the past is a factor, but I don't know if we need to go into the last two years day by day, event by event. I don't see how that is of any benefit to her." Thereafter the lawyer's examination was disjointed at best. Rebecca attempted to explain her mental health problems, her continued attempts at reunification, her love for her children, and her present ability to meet their best interests.

In its written statement of decision, the court wrote, "This County has expended tremendous public resources to try and help Rebecca. . . . [¶] Eugene and Rebecca did not suddenly develop problems when they came to Shasta County. Together they make for one of the most dysfunctional couples this Court has ever seen. That this family has been disintegrating should have been apparent to family members long ago. We suspect that most of Rebecca's family was very well aware of the problems and tried to intervene. We are certain that Carla tried. But Rebecca was unable or unwilling to accept their help . . . and despite some recent suggestions to the contrary she still is for the most part denying the level her own mental illness has played in this tragedy. [¶] Her testimony in Court was not helpful to her . . . and indeed, quite damaging. The Court observed a woman who is 'on the edge' emotionally and places irrational and inappropriate blame for her present situation upon governmental agencies."

The court found by clear and convincing evidence the children were adoptable, and concluded Rebecca had not sustained her burden of proof that her circumstances had sufficiently changed to justify a change in the previous orders. The court, therefore, terminated Rebecca's and Eugene's parental rights. Rebecca appeals.

### DISCUSSION

Rebecca launches a multifaceted attack challenging the sufficiency of reports, the adequacy of her legal representation, the rulings at the 18-month review hearing, the denial of her Welfare and Institutions Code section 388

motion, and the termination of her parental rights. We need not review many of these claims because here, as in many cases culminating in the termination of parental rights, the termination of reunification services and setting of the selection and implementation hearing marked a tragic turning point in the case and virtually assured the ultimate termination of Rebecca's parental rights.[2] ■ The department contends the juvenile court, having found it would be detrimental to return the children to Rebecca's custody, was required to terminate services and proceed to a Welfare and Institutions Code section 366.26 hearing according to the express terms of section 366.22.

The question thus presented is whether the juvenile court was compelled by law to terminate reunification services and order a Welfare and Institutions Code section 366.26 hearing when a parent, although hospitalized for treatment of her mental illness for most of the reunification period, had substantially complied with the reunification plan. We conclude neither the elaborate statutory scheme governing dependency proceedings nor case law strips the juvenile court of its discretion to accommodate the special needs of the family of the mentally ill in the unusual circumstances presented by this case.

I

■ The Legislature has defined the best interests of children in dependency proceedings along a statutory continuum. Family preservation, with the attendant reunification plan and reunification services, is the first priority when child dependency proceedings are commenced. (*In re Heather B.* (1992) 9 Cal.App.4th 535, 541 [11 Cal.Rptr.2d 891].) Reunification services implement "the law's strong preference for maintaining the family relationships if at all possible." (*In re Rebecca H.* (1991) 227 Cal.App.3d 825, 843 [278 Cal.Rptr. 185].) "To achieve the goal of preserving the family whenever possible, the Legislature required the county child welfare departments to develop and implement family reunification plans and required the courts to monitor those plans through periodic review. Family reunification efforts are required to begin with the first determination the child will be detained in juvenile court custody. (§§ 319; 361.5, subd. (a).) Thereafter the court must review the case at intervals of no less than six months and determine, among other things, whether reasonable reunification services have been offered. (§§ 366.21, subds. (e), (f), (g)(1); 366.22, subd. (a).)" (*In re Daniel G.*, *supra*, 25 Cal.App.4th at p. 1211.)

---

[2]The order terminating reunification services is reviewable on appeal from the final judgment terminating parental rights. (*In re Matthew C.* (1993) 6 Cal.4th 386, 388 [24 Cal.Rptr.2d 765, 862 P.2d 765]; *In re Daniel G.* (1994) 25 Cal.App.4th 1205, 1210 [31 Cal.Rptr.2d 75].)

At the other end of the continuum, however, the Legislature has determined a child's need for stability and security within a definitive time frame becomes paramount. The cutoff date for fostering family reunification is the 18-month status review. At this hearing, the court must return children to their parents and thereby achieve the goal of family preservation or terminate services and proceed to devising a permanent plan for the children. (Welf. & Inst. Code, § 366.22.) "The focus during the prepermanent planning stages is preserving the family whenever possible [citation] whereas the focus after the permanent planning hearing is to provide the dependent children with stable, permanent homes." (*In re Michael R.* (1992) 5 Cal.App.4th 687, 695-696 [7 Cal.Rptr.2d 139].)

The repercussions of terminating services and ordering a hearing to devise a permanent plan (Welf. & Inst. Code, § 366.26) reverberate through the cases. ■ "For all practical purposes, the tie between parent and child is severed by the referral to the section 366.26 hearing, because the court has terminated efforts to reunify the family, and now has only the circumscribed options of adoption, guardianship or long-term foster care for the child, none of which directly involves the parent. If the child is adoptable and if no extraordinary situation exists, termination of parental rights at the section 366.26 hearing is highly likely. Absent a change of circumstance, the juvenile court will no longer consider the reunification efforts of the parent." (*In re Taya C.* (1991) 2 Cal.App.4th 1, 7 [2 Cal.Rptr.2d 810], fn. omitted.) "After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child. [Citation.]" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 [27 Cal.Rptr.2d 595, 867 P.2d 706].) "Hence, the proceeding terminating reunification services and setting a section 366.26 hearing is generally a party's last opportunity to litigate the issue of parental fitness as it relates to any subsequent termination of parental rights, or to seek the child's return to parental custody." (*In re Matthew C., supra*, 6 Cal.4th 386, 392.)

The 18-month review hearing thus represents a critical juncture. The Legislature has determined that the juvenile court must embrace or forsake family preservation at this point by circumscribing the court's options. Pursuant to Welfare and Institutions Code section 366.22, "the court, at the 18-month hearing, shall order the return of the minor to the physical custody of his or her parent or guardian unless, by a preponderance of the evidence, it finds that return of the child would create a substantial risk of detriment to the physical or emotional well-being of the minor. . . . [¶] If the minor is

not returned to a parent or guardian at the 18-month hearing, the court shall develop a permanent plan. The court shall order that a hearing be held pursuant to Section 366.26 in order to determine whether adoption, guardianship, or long-term foster care is the most appropriate plan for the minor. . . . The court shall also order termination of reunification services to the parent. The court shall continue to permit the parent to visit the minor unless it finds that visitation would be detrimental to the minor. The court shall determine whether reasonable services have been offered or provided to the parent or guardian."

■ The record reflects the juvenile court was advised by the department and minors' counsel it had no discretion under the express terms of Welfare and Institutions Code section 366.22. In other words, the minors had to be returned to Rebecca's custody or services had to be terminated and a section 366.26 hearing ordered. Because Rebecca had been out of the hospital for only five weeks, the court found the children continued to suffer a substantial risk of detriment. The record also reflects the court's creative attempt to design a third alternative, allowing Rebecca the opportunity to demonstrate the stability of her recovery. Ultimately, the court was persuaded, however, the terms of section 366.22 were mandatory and foreclosed the exercise of any discretion.

## II

To put this case in perspective, we examine the parameters of governmental intervention during the reunification phase for special needs parents to enhance the probability of achieving the law's primary objective: family preservation, if possible. Our review of the cases, as well as the record, discloses the sometimes subtle, sometimes insidious, sometimes systematic, but sobering mistreatment and misunderstanding of special needs parents. We contrast the law with the sad facts of these stories.

More than a decade ago, we wrote, "Harm to the child cannot be presumed from the mere fact of mental illness of the parent and it is fallacious to assume the children will somehow be 'infected' by the parent. The proper basis for a ruling is expert testimony giving specific examples of the manner in which the mother's behavior has and will adversely affect the child or jeopardize the child's safety." (*In re Jamie M.* (1982) 134 Cal.App.3d 530, 540 [184 Cal.Rptr. 778], fn. omitted.) In *Jamie M.*, the minor's mother was diagnosed as schizophrenic. We rejected any inferences or stereotypes to be drawn from her labeled diagnosis and concluded: "The mere fact she is labelled a schizophrenic really tells us very little about her behavior and its affect [*sic*] on her children. How then is a court to use this crucial and yet

nebulous diagnosis in ruling on the proper disposition to be made of her children? It would appear that a diagnosis of schizophrenia should be the court's starting point, not its conclusion. Rather than mandating a specific disposition because the mother is schizophrenic, the diagnosis should lead to an in-depth examination of her psychiatric history, her present condition, her previous response to drug therapy, and the potential for future therapy with a focus on what affect [*sic*] her behavior has had, and will have, on her children." (*Id.* at p. 540.)

◼ If mental illness is the starting point, then the reunification plan, including the social services to be provided, must accommodate the family's unique hardship. The objective of the plan must be to provide services to facilitate "the resumption of a normal family relationship . . ." (*In re Christina L.* (1992) 3 Cal.App.4th 404, 414 [4 Cal.Rptr.2d 680]), and "must be designed to eliminate those conditions which led to the juvenile court's jurisdictional finding." (*In re Dino* E. (1992) 6 Cal.App.4th 1768, 1777 [8 Cal.Rptr.2d 416].)

*In re Victoria M.* (1989) 207 Cal.App.3d 1317 [255 Cal.Rptr. 498] is particularly instructive. The court held that a developmentally disabled natural parent is entitled to services which are responsive to the family's special needs in light of the parent's particular disabilities. (*Id.* at p. 1320.) Neither the reunification plan itself nor the services offered were "tailored to [the mother's] intellectual limitations." (*Id.* at p. 1327.) In light of the mother's obvious developmental disabilities, the court concluded the services were insufficient and the judgment terminating parental rights was reversed. (*Id.* at p. 1333.)

◼ We are aware that reunification services can be denied a parent pursuant to Welfare and Institutions Code section 361.5 provided the parent is suffering a mental disability "that renders him or her incapable of utilizing those services." (See also *Laurie S.* v. *Superior Court* (1994) 26 Cal.App.4th 195, 201 [31 Cal.Rptr.2d 506].) The department did not seek to deny Rebecca reunification services under this provision nor did it offer the requisite opinions of two qualified mental health experts that she was incapable of utilizing the services. (*In re Rebecca H.*, *supra*, 227 Cal.App.3d at p. 830.) Consequently, "[t]he effort must be made to provide suitable services, in spite of the difficulties of doing so or the prospects of success." (*In re Dino E.*, *supra*, 6 Cal.App.4th at p. 1777.)

Visitation and compliance with the reunification plan should be indicia of progress toward family preservation. Rebecca's record of visitation is exemplary. Although disappointed repeatedly by the department, she never missed

a scheduled visit and made persistent attempts to increase her visitation. Following her hospitalization and change of caseworkers, however, most of her efforts were rebuffed. Worse yet, Rebecca's diligence was belittled and her behavior demeaned. Rebecca, quite understandably, objected to the foster parents' apparent premature rush for adoption by changing her daughter's name, having the children use the foster family's last name, and referring to the foster parents as "mommy" and "daddy." But her protestations were labelled "inappropriate" and her "inability to control herself" was used as justification to deny later visitation. One wonders how a parent "appropriately" expresses dismay when a seemingly indifferent bureaucracy appears to be railroading his or her children into adoption.

Moreover, there is little in the record about the department's efforts to facilitate visitation during her hospitalizations. The record does not disclose whether visitation was attempted but failed due to Rebecca's condition, the lack of suitable facilities, or the distance, or whether the department simply failed to pursue some means of continuing visitation, even if brief or sporadic. Since there is some indication the hospital was geographically remote from the children's placement, there may have been justification for limiting the visitation. Unfortunately, due to the paucity of information set forth in the reports, we cannot determine the reason visitation was not provided.

A fitting analogy is presented by incarcerated parents who suffer obvious obstacles to visitation. Nevertheless the law is clear that reasonable services, most particularly visitation, must be provided. "Where a child is removed from a parent's custody in a dependency proceedings, the general rule, stated in California Rules of Court, rule 1456(e)(2), is that 'the court shall order visitation between the child and the parent or guardian, to be as frequent as possible, consistent with the well-being of the child.' In the case of an incarcerated parent, Welfare and Institutions Code, section 361.5, subdivision (e)(1)(C) states that reunification services may include '[v]isitation services, where appropriate.' " (*In re Monica C.* (1995) 31 Cal.App.4th 296, 306-307 [36 Cal.Rptr.2d 910].)

In another example of the difficulties facing the incarcerated parent, the mother in *In re Brittany S.* (1993) 17 Cal.App.4th 1399 [22 Cal.Rptr.2d 50], substantially complied with the terms of the reunification plan but visitation was not a component of the plan. Again, the judgment terminating parental rights was reversed and the court concluded: "Visitation could well have made the difference in this case because, contrary to the trial court's findings, Sheri substantially complied with the service plan as drafted. The plan required Sheri to 'address her issues of drug abuse and criminal lifestyle

through programs available at state prison.' That is precisely what she did; yet the social worker assigned to her case did not even bother to monitor Sheri's progress in these programs. Unfortunately, this appears to be a case where an incarcerated parent was destined to lose her child no matter what she did. We cannot condone such a result." (*In re Brittany S.*, *supra*, 17 Cal.App.4th at p. 1407.)

A parent hospitalized for treatment of mental illness suffers the same involuntary estrangement from his or her children as a parent who is incarcerated. If a convicted criminal is entitled to visitation and an ongoing relationship with his or her children, then surely a hospitalized, mentally ill parent deserves no less. Visitation in both circumstances may or may not be reasonable depending on the rules and regulations of the institutions involved, the condition of the parent, and the distance from the children's placement. The record should clearly reflect, however, the basis upon which a special needs parent is denied the opportunity to maintain visitation and an ongoing relationship with his or her child.

Rebecca's situation bears remarkable resemblance to the mothers in *In re Brittany S.*, *supra*, and *In re Venita L.* (1987) 191 Cal.App.3d 1229 [236 Cal.Rptr. 859]. She, like Sherri in *Brittany S.* and Linda in *Venita L.*, had substantially complied with the terms of the reunification plan and had insisted upon visitation as much as possible. Having taken parenting classes, sought medical treatment for her illness, filed for divorce from Eugene, and sought counseling and group support, it appears, as the court observed in *Brittany*, to be a case where the mother "was destined to lose her [children] no matter what she did." (17 Cal.App.4th at p. 1407.)

In summary, the law is clear that absent physical or emotional abuse, one of the primary objectives of dependency proceedings is to preserve the family. Family reunification efforts must be tailored to fit the unique challenges suffered by individual families unless a Welfare and Institutions Code section 361.5 disability is proven by clear and convincing evidence. In other words, the juvenile dependency system is mandated by law to accommodate the special needs of disabled and incarcerated parents.

What happens, however, when the efforts to reunify a special needs family collide with the statutory cutoff for reunification services at the 18-month hearing? As articulated earlier, does the language of Welfare and Institutions Code section 366.22 foreclose the juvenile court from exercising any discretion in a special needs case? A trilogy of recent cases suggests it does not. (*In re David D.* (1994) 28 Cal.App.4th 941 [33 Cal.Rptr.2d 861]; *In re Daniel G.*, *supra*, 25 Cal.App.4th 1205; *In re Dino E.*, *supra*, 6 Cal.App.4th 1768.)

### III

In both *In re Dino E.*, *supra*, 6 Cal.App.4th 1768 and *In re Daniel*, *supra*, 25 Cal.App.4th 1205, the juvenile court terminated services at the 18-month status review and ordered a Welfare and Institutions Code section 366.26 hearing believing it was hamstrung by section 366.22. In *Dino*, no reunification plan was ever developed for the father. As the court put it, " 'Nobody gave Mr. E. the map. He needed some direction. It wasn't there.' " (*In re Dino E.*, *supra*, 6 Cal.App.4th at p. 1777.) Nevertheless, the court denied the father's request to extend reunification beyond 18 months because it believed " 'the law doesn't permit it.' " (*Id.* at p. 1775.) Similarly, in *Daniel*, "Despite its view that [the department of children's services'] reunification efforts on behalf of Daniel and his mother had been 'a disgrace,' the court stated it felt constrained to order a hearing on a permanent plan for Daniel because '[t]his is the 18-month hearing date' and because [the department] had made reasonable reunification efforts in the first six months after Daniel's placement. . . ." (*In re Daniel G.*, *supra*, 25 Cal.App.4th at p. 1209.)

Both cases were reversed on appeal. In *Dino*, the court explained: "Section 366.22, which governs the 18-month review, does not specifically provide an option for continued reunification services. . . . Respondent argues . . . the Legislature intended the court to order a section 366.26 hearing at the 18-month review, even in the absence of a finding that reasonable services have been provided."

"We do not agree that this is the only logical conclusion to be drawn from these statutes. In the usual case, a service plan will be developed at the dispositional hearing and its implementation will be reviewed at six- and twelve-month intervals. Provisions that the court may extend services for an additional six months, but not beyond a total of eighteen months, promote the dual purpose of expediting a permanent placement for the child while at the same time allowing the parents the opportunity to reunite the family. Where no reunification plan is in place, however, a strict enforcement of the time line does not provide the opportunity to reunite the family. We do not believe that such a result was intended by the Legislature.

"We conclude that under the circumstances of this case, where the court was faced with the prospect that the 18 months had elapsed and no reunification plan had been developed for the parent, the court was entitled to weigh the various interests involved and exercise its discretion." (*In re Dino E.*, *supra*, 6 Cal.App.4th at p. 1778, fn. omitted.)

In *Daniel*, the court adopted the same rationale articulated in *Dino*. The court carefully analyzed the language of Welfare and Institutions Code

sections 366.22 and 366.26, concluding the Legislature did not intend to dictate expediency at the expense of family reunification. (*In re Daniel G.*, *supra*, 25 Cal.App.4th at pp. 1213-1214.) The court held: "We find nothing in the legislative intent or the specific language of section 366.22 or 366.26 which prohibits the court from extending the period for reunification services beyond 18 months from the child's detention where the agency responsible for providing these services has, in the court's opinion, failed to make a reasonable effort to provide those services.

"While the Legislature was concerned with reducing delays in arriving at a permanent resolution of the child's placement, we do not believe the Legislature intended a speedy resolution of the case to override all other concerns including 'the preservation of the family whenever possible' especially given the lengths to which the Legislature went to try to assure adequate reunification services were provided to the family. . . . [¶] The provision in section 366.22, subdivision (a) mandating a termination of reunification services if the child is not returned at the 18-month hearing only applies if the court at that hearing orders a permanent placement hearing. As we hold in this case, the court has discretion not to order such a hearing if it determines reasonable reunification services have not been provided. . . ." (*In re Daniel G.*, *supra*, 25 Cal.App.4th at p. 1214.)

Like the courts in *Dino* and *Daniel*, the juvenile court in this case felt statute-bound to terminate reunification efforts. Although the court offered a laudatory assessment of Rebecca's progress and expressed optimism about the prognosis for family reunification, the court was unaware it retained some discretion to continue reunification services beyond the 18-month period.

In *David*, Shelley, like Rebecca, did not abuse or neglect her three children. When her life collapsed and she left a physically abusive relationship, she voluntarily placed her young children with the welfare department. Also like Rebecca, Shelley visited the children regularly, the interaction was positive, and visitation was gradually increased. (*In re David D.*, *supra*, 28 Cal.App.4th at pp. 943-944.)

The attitude of the welfare department changed abruptly after Shelley attempted suicide and was admitted to a psychiatric hospital. (28 Cal.App.4th at p. 952.) The court points out the attempted suicide did not endanger the children. (*Id.* at p. 953.) In fact, Shelley had returned them to their foster placement before she overdosed on a prescribed medication. In the same way, the course of Rebecca's reunification was entirely different after she voluntarily admitted herself for treatment in January 1993. A new

social worker immediately sought to terminate reunification services and to adopt a permanent plan. Visitation was curtailed.

In *David*, we began, "This is an extraordinary and troubling case. This mother voluntarily placed her children in foster care because she was escaping an abusive environment and could not adequately care for the minors at that time. The social worker wrote glowing reports of the mother's progress and recommended the minors be returned to the mother within six months. However, when the mother's depression resulted in her attempted suicide by overdose of a prescribed medication, all efforts to help ceased. Instead of responding to the mother as disabled and in need of assistance, both the social worker and the juvenile court responded with an appalling lack of compassion for both the mother *and the minors*." (28 Cal.App.4th at pp. 951-952, italics in original.)

The obvious parallels continue. "After the mother's suicide attempt, the change in the attitude of the social worker is reflected in the reports and the testimony. The social worker criticizes the mother for reacting strongly when informed of the department's decision to seek termination of the mother's rights and adoptive placement for the minors—a decision representing an unexpected 360-degree turnabout from the department's position only three months earlier. The record reflects the minors began referring to their foster parents as 'mommy' and 'daddy' shortly after their placement, but when the mother explained to one of the minors she is their 'real' mother and the current caretaker is his foster mother, the social worker interrupted the conversation and told Shelley she was 'confusing' the minor. The minors were instructed to call their biological mother 'Shelley.' The mother is repeatedly criticized as 'selfish,' and as not having her children's best interests at heart because she did not want to relinquish her parental rights and permit adoption of her children by the foster parents. This distortion of reality is Kafkaesque." (28 Cal.App.4th at p. 952.)

In *David*, unlike *Dino* and *Daniel*, the juvenile court "specifically found 'reasonable reunification services have been provided and offered to the parents in this case.' " (28 Cal.App.4th at p. 953.) The issue, therefore, was not whether the trial court retained any discretion but whether it abused its discretion by finding reasonable reunification services had been provided. In *David*, the juvenile court itself had issued an order prohibiting visitation. We concluded the reunification services were inadequate since visitation had been proscribed and, consequently, the court abused its discretion by terminating services and ordering a Welfare and Institutions Code section 366.26 hearing. (*Ibid.*)

There is no question the Legislature, by adopting Welfare and Institutions Code section 366.22, intended to hasten the development and implementation of a permanent plan for children who previously spent endless years in

foster care limbo. As the cases report, however, section 366.22 was not designed to torpedo family preservation. Since the Legislature has consistently and repeatedly fostered reunification, if at all possible, the *David/Daniel/Dino* trilogy aptly construes the statutory scheme to allow the juvenile court discretion, albeit limited, to extend the reunification period. The trial court erred, therefore, by applying section 366.22 and terminating reunification services.

IV

A. *A Section 388 Modification*

Trapped by its misperception of Welfare and Institutions Code section 366.22, the juvenile court encouraged Rebecca to seek to modify its order terminating services and setting a selection and implementation hearing. This was a creative, but ineffectual, alternative. By the time a modification petition could be heard, the case was steamrolling toward adoption and Rebecca was required to bear the burden of proving, not only a change of circumstance, but her ability to surmount additional obstacles imposed by the department.

Welfare and Institutions Code section 388 provides in pertinent part: "Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court for a hearing to change . . . , modify, or set aside any order of court previously made or to terminate the jurisdiction of the court."

■ "At a hearing on a motion for change of placement, the burden of proof is on the moving party to show by a preponderance of the evidence that there is new evidence or that there are changed circumstances that make a change of placement in the best interests of the child. [Citations.] [¶] After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child." (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317; *In re Michael B.* (1992) 8 Cal.App.4th 1698, 1703 [11 Cal.Rptr.2d 290].)

■ Without clear and convincing evidence that return of the children to Rebecca would have been detrimental at the time of the 18-month review

hearing, the juvenile court would have been compelled to reunite the family. (Welf. & Inst. Code, § 366.22.) The burden of proof and quantum of evidences shift entirely at the conclusion of that pivotal hearing. We reject the department's implication that Rebecca's right to petition the court for a modification rendered any errors at the 18-month review harmless.

Here, the disintegration of visitation and Rebecca's ongoing efforts to maintain a positive relationship with the children after the 18-month review hearing is an acute illustration of the devastating consequences of a premature termination of services. The department repeatedly attempted to eliminate or restrict visitation. Maestas reported the children were beginning to behave aggressively during visitation. Rebecca's repeated efforts to foster a positive relationship with her daughters were thwarted by the department and the foster parents' refusal to grant holiday or additional visitation, or otherwise cooperate. Not surprisingly, the social worker assessing adoptability discounted the bonding between Rebecca and the children. In spite of her continued compliance with every aspect of the amended reunification plan, her best efforts were insufficient to sustain her burden of proving foster placement was not in the children's best interest. A Welfare and Institutions Code section 388 motion could not undo the prejudicial error perpetuated at the 18-month review nor derail the inevitable termination of her parental rights.

## B.  *The Section 352 Alternative*

"[T]he court may continue any hearing under this chapter beyond the time limit within which the hearing is otherwise required to be held, provided that no continuance shall be granted that is contrary to the interest of the minor. In considering the minor's interests, the court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements." (Welf. & Inst. Code, § 352, subd. (a).)

The mother in *In re Michael R.*, *supra*, 5 Cal.App.4th 687, found herself in a predicament not unlike Rebecca's. Her Welfare and Institutions Code section 366.26 hearing was scheduled three months before the conclusion of her residential drug treatment program. (5 Cal.App.4th at p. 692.) Although the juvenile court acknowledged "the mother is making great strides," it denied a section 352 motion to continue the selection and implementation hearing. (5 Cal.App.4th at p. 692.) The court, basing its ruling on its interpretation of the " 'limited purposes' " of the section 366.26 hearing, explained that " '. . . it appears . . . the Legislature has mandated that even

for compassionate reasons . . . the Court is precluded from considering return absent a 388 motion, once we are at the two-six hearing, [366.26] which is unfortunate because the mother is making great strides, . . .' " (5 Cal.App.4th at p. 692.)

Rebecca, unlike the mother in *Michael R.*, had completed her treatment, but the court wanted to allow her additional time to assure her stabilization. Like the court in *Michael R.*, the juvenile court believed compassion had been statutorily proscribed. The court overlooked Welfare and Institutions Code section 352 as a vehicle to accommodate Rebecca's special needs.

The court in *Michael R.* recognized the importance of Welfare and Institutions Code section 352 in the statutory scheme. "The Legislature's awareness of the importance of prompt and permanent placement of the minor is seen in section 352 which precludes the juvenile court from granting a continuance where it is contrary to the best interests of the minor. Section 352 mandates that before the court can grant a continuance it must 'give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements.' (§ 352, subd. (a).) Based on the clear and unambiguous language of section 352 we hold a court has discretion to consider a motion for continuance which is to be heard before the commencement of a selection and implementation hearing under section 366.26. [¶] Our holding is consistent with the overriding purpose governing dependency proceedings—the welfare of the minor. Section 352 contemplates there may be circumstances which will warrant a continuance of *any* scheduled hearing." (5 Cal.App.4th at p. 694, italics in original.)

Moreover, there is precedent for utilizing Welfare and Institutions Code section 352 at an 18-month review hearing without the request of counsel. In *In re Dino E.*, *supra*, 6 Cal.App.4th 1768, the court advised: "No motion was brought under section 352 in this case. We believe that statute indicates, however, that the court has discretion upon a showing of good cause to continue juvenile dependency hearings beyond the statutory time limits. Had the court here been inclined to continue the 18-month review hearing on the basis that adequate services had not been offered appellant, we believe it could have done so. . . . [¶] On remand the court may entertain a section 352 motion for continuance of services beyond the statutory time." (*Id.* at p. 1779.)

We concur with the rationale adopted by the courts in *Michael R.* and *Dino E.* Welfare and Institutions Code section 352 provides an emergency escape

valve in those rare instances in which the juvenile court determines the best interests of the child would be served by a continuance of the 18-month review hearing. The express language of section 352 circumscribes the court's discretion by emphasizing the minor's need for prompt resolution of his or her custody status. We conclude the unusual facts of this case required exigent judicial intervention. A section 352 continuance, rather than a future section 388 modification, is a mechanism the court could have utilized had it not erroneously concluded it was required to terminate services and order a selection and implementation hearing.

### DISPOSITION

The judgment terminating Rebecca's parental rights is reversed. On remand the court shall entertain a Welfare and Institutions Code section 352 motion for continuance of services beyond the statutory time. Our disposition renders moot Rebecca's other contentions, including her request for judicial notice.

Nicholson, Acting P. J., and Brown, J., concurred.