191 Cal.App.3d 1229 (1987)
236 Cal. Rptr. 859
In re VENITA L., a Minor.
STANISLAUS COUNTY DEPARTMENT OF HUMAN SERVICES, Petitioner and Respondent,
v.
LINDA L. et al., Objectors and Appellants
DON PAROLINI et al., Interveners and Respondents.
Docket No. F006760.
Court of Appeals of California, Fifth District.
May 12, 1987.
*1230 COUNSEL
Nancy Marsh, Linda A. Luke and Richard B. Barron, under appointments by the Court of Appeal, for Objectors and Appellants.
Michael H. Krausnick, County Counsel, and Harry P. Drabkin, Deputy County Counsel, for Petitioner and Respondent.
John J. Hollenback, Jr., and Strauss, Neibauer, Anderson & Hollenback for Interveners and Respondents.
*1231 Gretchen O. Burford, under appointment by the Court of Appeal, for the Minor.
[Opinion certified for partial publication.[*]]
OPINION
WOOLPERT, Acting P.J.
Appellant-father, John L., and appellant-mother, Linda L., appeal a court-review and permanency-planning hearing order respecting their minor child, Venita L., born July 14, 1983.
On October 26, 1983, respondent, Stanislaus County Department of Human Services (DHS), filed a petition to bring the minor within the provisions of Welfare and Institutions Code section 300, subdivision (a),[1] based on the following allegation: "That the minor, VENITA [L], age 3 months, has no parent or guardian actually exercising or capable of exercising proper and effective parental care or control in that her mother, Linda [L], was hospitalized on October 26, 1983, in the psychiatric inpatient unit at Scenic General Hospital for being gravely disabled. [¶] And that the minor's father, John [L], left the minor in the care of the minor's mother, Linda [L], who is psychiatrically disabled and unable to provide proper parental care." At the detention hearing on October 31, 1983, the juvenile court ordered suitable placement for the minor.
On November 23, 1983, both parents entered no-contest pleas to the allegations contained in the petition. Given the minor's out-of-home placement, the juvenile court subsequently conducted status review hearings pursuant to section 366 in April 1984, September 1984, April 1985, and October 1985. At the October 1985 hearing, the juvenile court referee found reunification had not been effected, nor was it likely to occur within the next six months. The referee further found the minor was an adoptable child and ordered county counsel to prepare and file a petition pursuant to Civil Code section 232, to free the minor from the custody of her natural parents for purposes of adoption. Pursuant to section 252, both parents sought a rehearing on court review and permanency planning.
On January 15 and 16, 1986, a judge of the superior court conducted the rehearing after which he terminated reunification services and ordered county counsel to file a Civil Code section 232 petition. It is this order which appellants now challenge.

*1232 FACTS
Venita L. first came to the attention of DHS and the juvenile court on October 25, 1983, as a result of her 16-year-old half-sister's complaint to child protective services. The 16 year old reported she was going to run away from home because her mother, appellant, was having a nervous breakdown. According to the 16 year old, she was expected to care for Venita L., then 3 months old, and her 2 other siblings, a 13-year-old girl and a 23-month-old boy. Appellant-mother was hospitalized the following day. The parents were then not married to one another.
At the time of the court's dispositional hearing, January 26, 1984, appellant-mother had been released to a board and care facility while appellant-father lived in a Modesto motel. Venita L. was in a receiving home. Appellant-mother thought she would be able to care for Venita L. and her other children "in a couple of months." Appellant-father said he could not provide a home.
As a result of these circumstances, DHS devised the following reunification plan: "[Mother] shall:
"1. Continue in therapy with the Stanislaus County Mental Health Department until her therapist states she no longer needs treatment.
"2. Establish and maintain her own residence.
"3. Have regular visits with the minor.
"When [Mother] has successfully completed the above and her therapist states that [Mother] is capable of caring for the minor, the social worker shall recommend the beginning of a trial visit.
"[Father] shall:
"1. Demonstrate that he is capable and willing to provide a home for the minor.
"2. Provide and maintain a suitable residence.
"3. Have regular visits with the minor.
"When [Father] successfully completes the above, the social worker shall recommend the beginning of a trial visit."
*1233 At the first status review hearing in April 1984, appellant-mother remained in the board and care facility; appellant-father lived with his parents. In the interim, between the dispositional hearing and the April review hearing, a newly assigned social worker developed formal reunification contracts with more precise requirements for the parents. Appellant-mother's reunification contract provided: "1. I will continue in therapy with the Stanislaus County Mental Health Department until my therapist states that I am no longer in need of mental health treatment.
"2. I will provide a statement from my therapist at the Stanislaus County Mental Health Department or other approved resource that I am capable of caring for my daughters.
"3. I will maintain regular visits with my daughters as arranged by the social worker.
"4. I will establish and maintain a suitable residence.
"5. I will demonstrate my ability to successfully maintain an independent living arrangement.
"6. I will allow the social worker to make unannounced visits to my home.
"7. I will sign any needed releases of information.
"8. I will cooperate with the social worker.
"9. I will advise the social worker of any changes in residence, any personal problems or other changes in my status."
Appellant-father's reunification contract provided: "1. I will demonstate that I am capable of and willing to provide a home for my daughter.
"2. I will establish and maintain a suitable residence for myself and my daughter.
"3. I will maintain regular visits with my daughter as arranged by the social worker.
"4. I will allow the social worker to make unannounced visits to my home.
"5. I will sign any needed releases of information.
"6. I will cooperate with the social worker.

*1234 "7. I will advise the social worker of any changes in residence, any personal problems or other changes in my status."
In late May 1984, appellant-mother was discharged from the "Day Treatment-Rehabilitative Program" in which she had participated since February of 1984. According to her occupational therapist, appellant-mother had markedly decreased her anxiety level to within normal limits and had shown good progress in achieving the goals set in the treatment program. Following her discharge, appellant-mother moved into a one-bedroom duplex with appellant-father. Both parents maintained on a monthly basis regular visitation with the minor. In June 1984, due to appellant-mother's discharge and her renewed relationship with appellant-father, DHS presented both appellants with amended reunification contracts. In addition to the previous terms, appellant-mother's amended contract required:
".... .... .... .... ....
"2. I will submit to a psychological evaluation to address the issue of my capacity to care for my daughters.
".... .... .... .... ....
"5. I will demonstrate my ability to successfully maintain a living arrangement with John [L] that is appropriate for my daughters.
".... .... .... .... ....
"10. I will participate with John [L] in the Family Intervention Program in a parenting/counselling program."
Similarly, appellant-father's amended contract added:
".... .... .... .... ....
"2. I will establish and maintain a suitable residence for myself, Linda [L] and my daughter and demonstrate my ability to maintain an appropriate home.
".... .... .... .... ....
"8. I will submit to a psychological evaluation to address the issue of my capacity to provide adequate care for my daughter.

*1235 "9. I will participate with Linda [L] in the Family Intervention Program in a parenting/counselling program."
Initially appellant-father was very resistive to the new plan; he indicated he would not participate in the parenting classes and counselling sessions. However, by August 1984, both appellants were attending regularly and participating actively in the parenting classes and counselling program operated by Therapeutic Homes. They were also counselled by a private psychologist, William Boblitt. In connection with item 2 of her contract, appellant-mother received a guarded but positive evaluation of her ability to parent and supervise her child. Appellant-father, on the other hand, did not receive a favorable psychological evaluation. The psychologist was concerned with appellant-father's ability to be an appropriate role model for Venita L. and the father's negative effect on appellant-mother.
At the time of the second status review hearing in September 1984, DHS recommended a new three-month contract be implemented and reunification services be extended through December 1984. This recommendation was based on the social worker's belief that the period of actual productive reunification had been short. DHS also recommended visitation be increased from once a month, based upon the parents' compliance with the reunification contracts.
Appellant-mother signed the new three-month contract in mid-September; it provided: "1. I will regularly attend and successfully complete the parenting counseling through the Family Intervention Program.
"2. I will continue to cooperate with my treatment through the Mental Health Department, which includes compliance with my prescribed drug treatment.
"3. I will provide appropriate and adequate care for Venita during any visitation. Visitation will be increased to include two half day visits, two all day visits, two weekend visits, one week visit."
Appellant-father initially rejected his new contract because it required his participation in Alcoholics Anonymous. This provision was apparently based upon a report that appellant-father had been arrested in August on a charge of being drunk in public. However, in late September he agreed to the terms of a supplemental reunification contract. The additional terms were:
".... .... .... .... ....

*1236 "2. I will initiate proceedings to obtain a divorce in order that I can marry [mother].
"3. I will attend Alcoholics Anonymous or other alcohol abuse program as approved by the Welfare Department.
"4. I will provide appropriate and adequate care for Venita during all visitation. Visitation will be increased as follows: two half day visits; two full day visits; two weekend visits; one week visit.
"5. I will obtain individual personal counseling to assist in dealing with my limited frustration tolerance and my tendency toward acting out behavior.
"6. I will participate in couples counseling with Mrs. [L] to explore our motivation for forming and maintaining a family unit."
The parents made progress toward reunification in the fall of 1984. In addition to their participation in the programs required in the contracts, the parents had two half-day visits with Venita L. in early October, followed by full-day visits once a week in late October and November, and two overnight visits in early December. Coincidentally, in October 1984, the juvenile court returned Venita L.'s three-year-old half-brother to the appellants' custody.
Then, on December 10, at a time when DHS was in the process of moving for a one-week visit in appellants' home by Venita L., appellant-father became intoxicated and violent. He hit appellant-mother in the face, bit her hand hard enough to draw blood, and broke a television and stereo. The mother had appellant-father arrested. The juvenile court on December 13th denied the motion for one-week visitation.
As a consequence of the December incident, DHS determined appellant-father was in need of intensive alcohol abuse counselling; it prepared a January 1985 addendum to the reunification contract which provided: "1. I will attend the Alcoholism Treatment Program or other alcohol abuse program approved by the Welfare Department and will achieve satisfactory reports.
"2. I will obtain individual personal counseling to assist in dealing with my limited frustration tolerance and my tendency toward violent and acting out behavior and will achieve satisfactory reports."
Once again, appellant-father initially refused to sign the addendum and cooperate or even discuss the matter with DHS; he did not sign the *1237 addendum until late February 1985. In the interim, DHS suspended visitation in the parents' home due to the father's alleged potential for violent behavior and refusal to deal with his alcohol problem. Thereafter, appellant-father started individual and group counselling through Stanislaus County's Substance Abuse Program. However, his attendance and progress were limited. According to his counsellor, appellant-father needed to make a commitment to treatment by his own choosing and not merely because he was told to do so. There was renewed visitation during this period, with monthly visits at the welfare department.
At the next review hearing in April 1985, the juvenile court continued reunification services and counselling over DHS's recommendation of an adoption permanency plan. In July 1985, the juvenile court ordered a more liberal visitation plan, including one day a week visitation and overnight visitation every other week.
In the interim, the parents signed new reunification contracts on May 9, 1985. The following day appellants were married. DHS felt appellant-father needed to do more than merely schedule and attend his appointments with Substance Abuse Services. He needed to make a commitment and deal with his alcohol problem. However, appellant-father did not believe he had an alcohol problem; he claimed he could control his drinking without outside assistance and would attend the sessions only because they were court ordered.
Evidence would later come to the court's attention that in January 1985, appellant-father used his fist to smash a window in the family home. After seeking treatment at a nearby hospital, he was arrested on a drunk-in-public charge. Appellant-father was again arrested on a public-drunkenness charge in February 1985. In August 1985, a court employee saw him drinking from a beer cup at the county fairgrounds; appellant-father appeared intoxicated at the time.
Substance Abuse Services terminated appellant-father's individual counselling services in June 1985 due to his lack of progress. However, he was urged to continue attending the program's group sessions. He attended five one-hour weekly meetings of the group over a two-month period.
Then, on September 25, 1985, during one of Venita L.'s overnight visitations, appellant-father came home drunk, and in his own words, "just went crazy." He threw things around the house, tore up some of the appellants' wedding pictures, and left. He was apparently upset about Venita L.'s dependency and the chances for reunification. At the time both Venita L. and her *1238 half-brother were in the house, taking a bath. The mother called her mother-in-law to come for her and the children.
In the meanwhile, since early 1984, Venita L. lived with a foster family who expressed a desire to adopt the child. The foster parents and Venita L. had bonded such that Venita L. regarded her foster parents, according to psychologists, as her psychological parents.

DISCUSSION

I.-V.[*]
.... .... .... .... ....

VI. SUFFICIENCY OF THE FINDINGS.
At the conclusion of the rehearing the judge found: reunification had failed; there was no reasonable expectation that any future effort would have any different result; and the child's best interests required that she continue as a dependent.[4]
*1239 (1) The court, however, did not make a clear finding that Venita L.'s return to her parents' physical custody would create a substantial risk of detriment to her physical or emotional well-being. Citing Civil Code section 4600,[5] and In re B.G. (1974) 11 Cal.3d 679 [114 Cal. Rptr. 444, 523 P.2d 244], as well as section 366.2, subdivision (e), appellant-mother urges there must be an express finding of detriment before a permanency plan may be adopted. We agree.
Section 366.2, subdivision (e), specifically requires the return of the minor child to the parents' custody unless the court "finds the return of the child would create a substantial risk of detriment to the physical or emotional well-being of the minor." (Italics added.) This is consistent with Civil Code section 4600 and In re B.G., supra, 11 Cal.3d at pages 698-699, interpreting Civil Code section 4600. Both require a finding that an award of custody to the parent would be detrimental to the child in order to sustain an order granting custody to a nonparent.
In cases following In re B.G., but not involving section 300 proceedings, the state Supreme Court has rejected any requirement of an expressed finding of detriment in the absence of a request for a statement of decision (formerly findings of fact and conclusions of law) pursuant to Code of Civil Procedure section 632. (Michael V. v. Jamie B. (1985) 39 Cal.3d 787, 792 [218 Cal. Rptr. 39, 705 P.2d 362]; In re Richard E. (1978) 21 Cal.3d 349, 356 [146 Cal. Rptr. 604, 579 P.2d 495].) Instead, as in the case of Michael V., the Supreme Court assumed the trial court made whatever findings were necessary so that the only issue was whether substantial evidence supported the implied finding. (Michael V., supra, 39 Cal.3d at p. 793.)
In this case, as will be explained, we can neither assume a finding of substantial risk of detriment was made, nor can we imply such a finding from the express findings made. However, we need not rely on a more general statute such as Civil Code section 4600 and interpretive case authority. Here section 366.2 specifically requires the child's return unless there is a finding of substantial risk of detriment.
*1240 Indeed, in a permanency-planning hearing culminating in an order for Civil Code section 232 proceedings, such as in the present case, the Legislature requires three findings (§§ 366.2 and 366.25). In addition to the finding of substantial risk of detriment under section 366.2, the court must find: no substantial probability exists that the minor will be returned to the physical custody of his or her parent or guardian within six months (§ 366.25, subd. (c)); and the likelihood the minor can or will be adopted (§ 366.25, subd. (d)(1)).
Given our experience in this case and the language of the code, we believe the better practice is for the juvenile court to make express findings at the permanency-planning stage pursuant to sections 366.2 and 366.25 notwithstanding any Code of Civil Procedure section 632 request. Such findings are important preliminary steps to Civil Code section 232 proceedings and will benefit the appellate process.
It is unclear from the record whether the court considered substantial risk of detriment when it made its findings and orders. There was no reference to such requirement in either counsel's arguments, the probation department's report (specifically its recommendation), or the court's order. At most, the court-appointed psychologist and the psychologist retained by the foster parents concluded it would be psychologically detrimental to remove Venita L. from her foster home. Their conclusions were based on Venita L.'s bonding with her foster parents whom they believed she regarded as her psychological parents and the differences in parenting styles between the foster parents and the appellants. Such evidence is significant. However, Venita L.'s bonding may not be isolated from the other circumstances to be considered when evaluating the evidence for proof of substantial risk of detriment. She went to live with her foster parents when she was less than a year old; she has lived with them since that time. According to the evidence presented, her bonding was a natural and inevitable phenomenon.
If a child's immediate bonding or attachment to foster parents could outweigh all other considerations, then reunification services, especially in the case of a very young child such as Venita L., would serve no meaningful purpose. At best the court would merely pay lip service to the concept of parenting as a fundamental constitutional right. A dependent child's psychological bond with a foster parent may not be so easily used to satisfy the requirement of Civil Code section 366.2, subdivision (e).
We do not minimize the importance of bonding in the critical early years of childhood. Likewise, we understand bonding in this type of case is the result of circumstances which may include special love and care by the foster parents, as well as deficits of some kind on the part of the natural parents. *1241 The Legislature has made it clear substantial efforts should be made to accelerate the rehabilitation of the natural parents, with short time periods to avoid a strong bonding between the child and substitute parents. A decision to give the natural parents more recovery time proportionately increases the possibility of bonding, to the point that once the natural parents become "suitable," the bonding may be so strong it would be detrimental to the child if the new relationship is terminated. As an example of the difficulty this concept presents, see In re B.J.B. (1986) 185 Cal. App.3d 1201 [230 Cal. Rptr. 332], where the trial court refused to make the finding of detriment when bonding was present, and a divided appellate court differed on the importance of bonding.
In section 366.2, subdivision (e), the Legislature mandates the juvenile court to review the probation officer's report, which in this case included references to the child's out-of-home placement and bonding. Yet it also requires the court to consider the efforts and progress or both, demonstrated by the parent and the extent to which he or she cooperated and availed himself or herself of the services provided.
In addition to Venita L.'s bonding with her foster parents, the juvenile court found reunification had failed. This finding was premised in large part on appellant-father's alcohol abuse and failure to cooperate with reunification. Yet, his alcohol abuse was not the basis for dependency in the first instance. The basis for dependency dramatically shifted during the pendency of the proceedings, a circumstance which causes us some concern.
Originally, Venita L. came to the juvenile court's attention because of her mother's psychological disability which required in-patient care and her father's abandonment. There was no parent to care for the infant. Yet in May 1984, the mother was discharged as mentally and emotionally stable. By September 1984, DHS increased visitation due to the parents' compliance with the reunification contracts. Nevertheless, the attention began to shift in September 1984 to appellant-father and his alcohol abuse. By August 1985, DHS offered the following evaluation to the court: "... The father has continued to be hostile and argumentative and has not successfully completed the terms for reunification.
"The father has a lengthy history of alcohol abuse and related violent behavior in the home. Although there are periods when the father appears to have his alcohol problem under control, the pattern has been for the alcohol abuse to recur periodically and to result in violence in the home. The father has continually failed to successfully complete an alcohol abuse counseling program and has failed to deal with his alcohol problem. There have *1242 additionally been reports that the father is continuing to consume alcoholic beverages.
".... .... .... .... ....
"The parents have had twenty-two months of reunification services and have not been able to successfully complete the terms for reunification. The minor needs a stable environment without the potential danger of alcohol-related violence in the home. The parents cannot provide such a home for the minor due to the father's extensive history of alcohol abuse and his failure to make a concerted effort to overcome his alcohol problem."
Section 366, subdivision (a), directs the juvenile court on periodic review to: "[D]etermine the continuing necessity for and appropriateness of the placement, the extent of compliance with the case plan, and the extent of progress which has been made toward alleviating or mitigating the causes necessitating placement in foster care...."
Section 366.1, subdivision (d), directs the probation department to discuss and thus presumably consider in its recommendation: "What actions, if any, have been taken by the parent to correct the problems which caused the child to be made a court dependent." (§ 366.1, subd. (d).)
The underlying concern in these sections is whether the problem(s) which caused the child to be made a dependent and placed out of the home still exist. The cause of dependency and placement in 1983  the mother's psychiatric disability and the fact the father left Venita L. with the mother while she was in this condition  no longer existed in 1985 and 1986.
Under a strict reading of section 366, subdivision (a), and section 366.1, the juvenile court should have returned Venita L. to her parents well before the time of the permanency-planning hearing from which this appeal is taken. Yet such a reading raises the question: Should the juvenile court ignore claims of new, or at least previously undetected, problems which could affect dependency? The answer: Certainly not. Rather, if the original cause(s) necessitating dependency have been substantially alleviated, then the juvenile court, in considering "new" problems, should determine first whether the so-called new problem is no more than another manifestation of the original basis for dependency. If not, the court should determine whether the new problem would sustain a jurisdictional finding.
To do otherwise disregards the apparent goals of dependency proceedings: to protect those children who come within the provisions of section 300 and, where possible, to assist the parent(s) in alleviating or mitigating the causes *1243 of dependency so that out-of-home placement can be terminated. Dependency proceedings should not be allowed to drift from major problem-solving circumstances to prolonged attempts to resolve shortcomings in the parental home which would not cause dependency in the first place.
We do not mean to make light of appellant-father's alcohol abuse. Yet even DHS concedes alcohol abuse alone is insufficient to deprive a parent of the right to custody. (See In re Jeannette S. (1979) 94 Cal. App.3d 52 [156 Cal. Rptr. 262].) Furthermore, it is not clear appellant-father's conduct would sustain a finding that Venita L. came within the juvenile court's jurisdiction. At worst, he suffered from alcohol abuse which on more than one occasion over a period of approximately 15 months led to his explosive behavior.
Nevertheless, DHS relies on a number of factors to support the court's orders: (1) the December 1984 incident led to appellant-father's "incarceration," and the September 1985 incident caused him to temporarily leave the home; (2) both acts occurred during or around the time of an overnight visitation by Venita L.; (3) after the September 1985 incident, the mother took the children away from the home, evidencing the dangerousness of the situation; and (4) Venita L. was afraid to get into the bathtub, and would not have anything to do with her foster father for approximately two and one-half days after her return from the September 1985 visitation. Yet, it is not clear if even this additional evidence would warrant a jurisdictional finding that Venita L. came within section 300, much less a finding that her return would create a substantial risk of detriment to her physical or emotional well-being.
The record suggests DHS was as much concerned with appellant-father's attitude toward and lack of cooperation with DHS as it was with his alcohol abuse. Moreover, DHS now appears to argue: While the cause for dependency may have been eliminated, and appellant-father's alcohol abuse was insufficient to deprive him of the right to custody, his lack of cooperation with reunification would be sufficient to support a finding that reunification had failed. Once again, this kind of argument loses sight of the purpose of dependency proceedings and reunification  to help eliminate problems which lead to or require dependency. The trial court noted the father's alcohol abuse problem was "at the root of the parties' problems." However, it also observed the father was "somewhat getting ahold of [that problem]." Nevertheless, because of the emphasis on bonding, and failure to make more certain findings, we cannot tell whether there was an adequate basis for an implied conclusion of detriment.
Appellant-mother complied with each plan which her social worker devised, with one exception. While she agreed to immediately advise the *1244 social worker of any personal problems, she did not report the father's alcohol-induced violent behavior in December 1984 or September 1985. Given the fact that Venita L. became a dependent of the court by virtue of appellant-mother's psychological disability, it appears unduly harsh, and indeed stretching the concept of a parent's effort or progress towards reunification, to conclude the mother failed at reunification due to her failure to report the two isolated incidents. DHS suggests appellant-mother's failure to report two incidents may mean there were other unreported incidents of the father's violence; DHS notes it only learned fortuitously of the 1984 and 1985 episodes. Yet this is no more than unsupported speculation.
Appellant-mother claims the juvenile court ignored her efforts at reunification and focused instead on the problems related to the father's alcohol abuse. She suggests the court should have made separate findings as to each parent here. We agree.
The language of section 300, subdivision (a), offers support for separate findings as to each parent. The provision brings any child within the juvenile court's jurisdiction "[w]ho is in need of proper and effective parental care or control and has no parent or guardian, or has no parent or guardian willing to exercise or capable of exercising care or control, or has no parent or guardian actually exercising care or control." (Italics added.) The clear inference is that if there is one parent willing to, capable of, or actually exercising care or control, then there is no need for the court's continuing jurisdiction, absent a "family unit" problem which we mention next.
DHS argues the juvenile court properly treated the parents as a unit in this case. According to DHS, appellant-mother knew or should have known if she wanted the court to return Venita L. to her, she would have to live apart from appellant-father. She made her "choice" when she married him in 1985. Thus the court had no choice but to deal jointly with the parents. The record, however, will not support such a theory.
Nothing in the multiple reunification contracts, the social worker's reports or the court's orders, put appellant-mother on notice that she had a choice to make. Indeed, little or no consideration appears to have been given to reunifying Venita L. with only appellant-mother. A review of the reunification contracts suggests as time passed DHS premised reunification on the father and mother forming a family unit, rather than helping to reunify the child with at least one of her parents. Whether DHS initiated the goal of a family unit consisting of father, mother and daughter, or was merely responsive to the parents' desire to be together is unclear. Nevertheless, DHS is in a poor position to argue through hindsight that appellant-mother should *1245 have known she could not be reunited with Venita L. so long as appellant-father was in the picture.
Last, in finding a failure of reunification services, the juvenile court mentioned the parties had not completed the reunification program through Therapeutic Homes because the parties' problems were too extensive for the agency to handle. The social worker, in her report to the court in August 1985, stated the parents did not successfully complete the program and were in fact discharged because their problems were beyond the program's scope. However, the letter from Therapeutic Homes attached to the social worker's report does not support this conclusion. The parents received counselling through Therapeutic Homes between June and December 1984. In conjunction with the six-month reunification contract signed in June 1984, a treatment plan was written at Therapeutic Homes contracting the parents to attend a minimum number of counselling sessions and individual sessions in order to facilitate meaningful visits with Venita L. While appellant-father's attendance in these counselling sessions was sporadic during the six-month period, appellant-mother attended the group and individual sessions without problems. Although the counsellor found only marginal improvement, there is no evidence the parents' problems were, as the social worker later characterized them, "too extensive for [Therapeutic Homes] to handle." Indeed, the parents were apparently discharged because the six-month period had elapsed.
We do note the suggestion made at oral argument that the juvenile court had prior experience with the mother and her family and this had some bearing on the court's attitude toward possible reunification. We do not deny that possibility, but find nothing in the record to support that kind of "judicial notice." The trial court made no reference to prior family history as a basis for its orders.
Given the mother's substantial compliance with the five reunification plans instituted in this case, and the possible insufficiency of the father's alcoholism to support a finding of dependency, much less a substantial risk of detriment, we cannot affirm the orders of the court absent express findings. (2) It is true that "[i]f there is any substantial evidence to support the findings of a juvenile court, a reviewing court is without power to weigh or evaluate the findings." (In re Carrie W. (1978) 78 Cal. App.3d 866, 872 [144 Cal. Rptr. 427].) However, absent the required findings there can be no such deference to the trial court. We will not make the findings. (In re B.J.B., supra, 185 Cal. App.3d at pp. 1209-1211.)
Following the lead of the court in In re B.J.B.: "On remand the trial court will not be limited to considering the evidence previously presented but may *1246 receive any evidence bearing on the issue of custody at the time of rehearing. [Citation.]" (Id. at p. 1211, fn. 7.) Because of the updating process, any juvenile court judge may hear the matter.
The orders of the court are reversed and the cause remanded for further proceedings consistent with this opinion.
Hamlin, J., and Harris, J.,[**] concurred.
A petition for a rehearing was denied June 2, 1987, and the petitions of respondent Stanislaus County Department of Human Services and the Minor for review by the Supreme Court were denied August 12, 1987. Mosk, J., was of the opinion that the petitions should be granted.
NOTES
[*] Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts I through V.
[1] All statutory references are to the Welfare and Institutions Code unless otherwise indicated.
[*] See footnote on page 1229, ante.
[4] Specifically the court made the following remarks: "In the intervening years of time various social workers have extended to the [L's] a number of reunification plans that they have felt needed to be complied with before the reunification would take place. These plans have failed for a number of reasons and, most significantly, being Mr. [L's] substance abuse, being alcohol, a problem that he apparently is somewhat getting ahold of now, but in the past has not admitted nor does he seek help for, but a problem which continues to be at the root of the parties' problems. He testified that in the September incident he had not had anything to drink, but yet we know from Mrs. Call that he was drunk at the time.

"The violent incident which occurred in September where the children were in the home and in the bathtub obviously had a profound [e]ffect on both children, and especially Venita, as expressed by her in her subsequent actions with the care-taking parents.
"Another concern, that was voiced by counsel, is that, for whatever reason, these incidences are going, are going unreported and only become, or came to the surface as a result of some comment by the youngest boy that is involved.
"The parties have attended the Family Maintenance and Reunification Program through Therapeutic Homes, and that was not completed apparently because the problems were too extensive for them to handle.
"The Court feels that the Department of Social Services has done everything reasonable that could be expected under these circumstances, and even more, to get this family back together, and the efforts have resulted in failure. And the Court doesn't expect that anything in the future would reasonably change that outlook.
"On the other side of the case, looking at the best interests of the minor, she has been placed in a stable, loving environment since October of 1983. She's been bonded to the foster parents. And, as Dr. Olson, the Court's appointed doctor indicates, that to break that bond would clearly result in psychological distress of a considerable degree and would have increasing difficulty forming  and she would have increasing difficulty forming  intimate attachments for the rest of her life.
"Even without the information as provided in Dr. Trompetter's report, there is no question that all reasonable efforts have been made to reunite this minor with her parents. The efforts have failed, and there is no reasonable expectation that any future effort will have any different result."
[5] Civil Code section 4600 provides in relevant part:

"(a) .... .... .... .... ...
"In any proceeding where there is at issue the custody of a minor child, the court may, during the pendency of the proceeding or at any time thereafter, make such order for the custody of the child during minority as may seem necessary or proper ...
".... .... .... .... ....
"(c) Before the court makes any order awarding custody to a person or persons other than a parent, without the consent of the parents, it shall make a finding that an award of custody to a parent would be detrimental to the child and the award to a nonparent is required to serve the best interests of the child."
[**] Assigned by the Chairperson of the Judicial Council.