Filed 5/30/14  V.C. v. Superior Court CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| V.C.,<br><br>　　　　Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF ALAMEDA COUNTY,<br><br>　　　　Respondent;<br><br>ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>　　　　Real Party in Interest. | A140888<br><br>(Alameda County<br>Super. Ct. No. HJ11017054) |

Petitioner, V.C., father of three-year-old Isabella N., seeks review by extraordinary writ, pursuant to California Rules of Court, rule 8.452,[1] of the juvenile court's findings and orders, in which the court terminated reunification services and set the matter for a permanency planning hearing, pursuant to Welfare and Institutions Code section 366.26.[2] Petitioner contends substantial evidence does not support the juvenile court's finding that return of Isabella to his custody would create a substantial risk of detriment to Isabella's physical or emotional well-being.  We shall deny the petition for extraordinary writ.

---

[1]All further rule references are to the California Rules of Court.

[2]All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

1

## FACTUAL AND PROCEDURAL BACKGROUND

On June 1, 2011, the Alameda County Social Services Agency (Agency) filed an original petition alleging that Isabella N. came within the provisions of section 300, subdivisions (a),(b), and (e). Specifically, the petition alleged that, from May 8 to May 22, 2011, then five-month-old Isabella was hospitalized for a non-accidental brain injury, due to probable suffocation, and that, on May 26, she was diagnosed with a non-accidental fracture of her left distal femur. The petition further alleged that Isabella's mother, Jennifer N. (mother), had untreated depression and the father, petitioner, had given multiple stories that were inconsistent with Isabella's injuries. He first suggested that the broken leg may have occurred after he strapped her into her car seat and her leg got caught in the car door, but later told law enforcement that he had made up that story and that he may have rolled onto her while sleeping. He then said that Isabella's leg might have been broken while she slept between him and mother, "as he is known for 'punching motions' while in a deep sleep." Regarding the brain damage, petitioner said he noticed Isabella face down on blankets in her crib and that her eyes were rolling to the back of her head, but he thought she was okay and went to work. A pediatric neurologist had stated that Isabella's MRI results showed that, as a result of her brain injuries, she would be at high risk for cerebral palsy, vision problems, not being able to walk, epilepsy, and severe mental retardation.

In a detention report filed on June 2, 2011, the social worker reported that petitioner told her that Isabella's leg injury occurred when he tried to put Isabella, in her car seat, into the back of their car and she "stuck her leg out and it twisted against the side of the door." The social worker recommended that Isabella, who was still hospitalized, be detained. Regarding the brain damage, mother stated that she was certain that Isabella had had seizures as a side effect of immunizations. Both parents denied any abuse. During a subsequent meeting, petitioner acknowledged that he had told law enforcement that he had made up the story about how the minor broke her leg, and said he may have

2

accidentally punched her while he was asleep next to her.  Regarding the brain injury, he said he was at work when mother texted him that Isabella's eyes were rolling in her head, but that his boss would not allow him to leave work to address the issue.

In a jurisdiction report filed on June 17, 2011, the social worker reported that Isabella was still hospitalized.  The social worker recommended that Isabella be made a dependent of the juvenile court, but requested that the disposition hearing be continued to allow more time to collect information from pending medical examinations and the active criminal investigation.

In an addendum report filed on August 26, 2011, the social worker continued to recommend that Isabella be made a dependent of the juvenile court.  The social worker related that Isabella was discharged from the hospital on July 19, and was placed in a foster home with foster parents who had been trained to medically care for her.  The parents had begun weekly supervised visits.

In the disposition report filed on October 27, 2011, the social worker related that Isabella continued in her foster family placement.  It was still uncertain how she had sustained her initial injuries.  The social worker recommended that Isabella be made a dependent of the juvenile court and that both parents receive family reunification services.

On October 28, 2011, the juvenile court sustained the allegations in an amended petition, which had been filed on October 25 pursuant to section 300, subdivisions (a) and (b), adjudged Isabella a dependent of the court, ordered that she remain in an out of home placement, and ordered supervised visitation and reunification services for the parents.

In a status review report filed on March 26, 2012, the social worker reported that Isabella had been diagnosed with static encephalopathy, which is very similar to cerebral palsy, and cortical visual impairment.  She also had a history of seizures.  As a result of the lack of oxygen to the brain she had suffered, she had extensive brain damage and global developmental delays.

The social worker related that petitioner had been "mostly consistent with his case plan, yet quite inflexible with regards to Isabella's medical care, medical diagnosis, medical treatment and infant/parent psychotherapy." The social worker believed that it would be detrimental to return Isabella to her parents' care because "[o]ne or both of the parents injured Isabella[,] likely out of frustration, depression, rage, overwhelm [*sic*] and whether deliberately or not there has been little to no movement towards addressing why it happened or the emotions that were behind the injuries." The social worker further believed that the parents' "history of hostility with medical providers" would place Isabella at risk were she placed with them.[3]

The social worker recommended that reunification services be terminated for both parents and that a section 366.26 hearing be set, with the plan being adoption with the current caregivers.

---

[3]For example, the parents had claimed not to understand the need for a nasogastric tube (NG-tube) to ensure that Isabella received sufficient nutrition and repeatedly resisted surgeries to insert a gastronomy tube (G-tube), which would provide a more permanent solution than the NG-tube would.

Other information about the parents' progress included a March 1, 2012 letter attached to the status review report, in which a psychologist who had been providing infant-parent psychotherapy to Isabella, petitioner, and mother described the parents, in their meetings with various medical professionals, as appearing to "struggle significantly" to follow the conversation and understand simple procedural information. They also "did not seem to demonstrate what was most needed, which was a capacity to hold their daughter's experience in mind. They asked questions that appeared unrelated to the gravity of Isabella's medically fragile state, and frequently misunderstood the information presented." The psychologist further observed that petitioner "presents with high anxiety, inattentiveness, grandiosity, and often becomes preoccupied with insignificant details . . . ."

In addition, in a psychological assessment report, completed on December 1, 2011, the psychologist opined that petitioner "is an individual who appears to live by his own set of rules. If he does not fully agree with the establishment, he will decide what is best for him. He appears primitive in his thought process, although there is no evidence of a cognitive deficit. He works hard at impressing others who might be in a position of power but at the same time he is distrustful, suspicious and defended [*sic*]. He is not self disclosing and may not even be capable of admitting to wrongdoing."

4

In an addendum report filed on August 2, 2012, the social worker related that the parents had been working "methodically" on their case plan objectives, were not obstructing Isabella's medical procedures, and had shown the capacity to work collaboratively with various providers and to be courteous with the foster parents. The parents had recently begun participating in infant/parent psychotherapy and the social worker believed that, if the parents were provided therapy and more visitation with Isabella, "the Agency will get a better portrait and understanding of their capacity to parent a medically fragile child with multiple appointments. Although the Agency has serious concerns about their ability to read Isabella's non-verbal cues and process information, giving them additional time might be effective." The social worker further wanted "to see if the parents have the capacity to process medical information and demonstrate some level of capacity to care for Isabella's medical, physical and emotional needs."

The social worker observed that, during recent visits, the parents "demonstrated intense overwhelm" when Isabella was crying for 15 or 20 minutes. They immediately wanted to take her to the hospital rather than look at other possible reasons for her distress, such as hunger. The parents had also repeatedly overfed Isabella, causing her to regurgitate food, which indicated "that perhaps the parents do not learn from past mistakes." The social worker recommended that family reunification services continue until the 12-month hearing.

On August 6, 2012, the juvenile court ordered, inter alia, that reunification services were to continue, pending the 12-month review hearing.

On August 21, 2012, the juvenile court denied petitions for writ of habeas corpus, filed by each parent, in which they had alleged ineffective assistance of counsel based on counsel's failure to advise them of evidence from the Department's child abuse consultant, Dr. James Crawford, indicating that he did not believe child abuse had occurred in this case. The court, however, concluded that the parents had not provided

5

any reliable evidence related to this assertion and found, from what had been presented to the court, that Dr. Crawford could not definitively state whether or not physical abuse had caused Isabella's injuries.

In an August 30, 2012 interim review report, the social worker related that, since the August 6 hearing, the parents had had four supervised visits with Isabella in their home. During the visits, the parents were "engaging and loving," demonstrated the capacity to read Isabella's cues, and were open to suggestions. Their anxiety had dramatically decreased and Isabella seemed more comfortable and relaxed with them. The parents continued to attend individual therapy as well as infant/parent psychotherapy, and were attending Isabella's medical appointments. Petitioner had begun working part-time as a certified nursing assistant. The social worker's main concern was the parents' apparent inability "to grasp the gravity of Isabella's medical condition and comprehend the vast medical information from Isabella's various medical providers." The parents had "obstructed" Isabella's G-tube placement in May and a related surgery in August and, while their opposition to the surgeries as well as to immunizations had "been alarming," it was also understandable given various medical mishaps that had occurred.

The social worker recommended continued reunification services and visitation, pending the 12-month status review hearing, and the court so-ordered.

On October 16, the social worker filed a 12-month status review report, in which she reported that petitioner had been actively working on his case plan and that Vivette Catipon, the infant/parent psychotherapist, had indicated that she was working with petitioner on decreasing his anxiety. Catipon had also sent a progress report to the social worker in which she expressed the belief that Isabella "would thrive and be safe" in the care of her parents. Petitioner's therapist, Bonnie Evans, had recommended, in a report to the social worker, that Isabella be returned to her parents' care as soon as possible, after a transitional period. Early interventionist, Jennifer Galdeira, who had been working with the family, had seen progress in petitioner's ability to tolerate Isabella's

6

crying and to play with and nurture her. The parents had weekly supervised visits with Isabella, and were nurturing and engaging during visits. They had also begun partially supervised visits in their home, which were going well.

The social worker reported that Isabella had undergone surgery for placement of a G-tube on June 4, and was briefly hospitalized a few days later after the G-tube was displaced. After a meeting between the parents and doctors at Stanford Hospital on August 2, to obtain a second opinion as to the necessity of another G-tube surgery, the G-tube came loose and it became an emergency situation. The parents refused emergency surgery at Oakland Children's Hospital because they wanted any surgery to take place at Stanford. The next day, the social worker obtained an ex parte court order for the emergency surgery for placement of a new G-tube at Children's Hospital, where the original surgery had been performed and where Isabella's medical records were located. The foster parents reported that Isabella had been happier and less fussy since having the G-tube surgery.

The social worker further reported that, although the parents had "tackled their case plan objectives with relative ease over the reporting period, the undersigned's outstanding concerns revolve around the parents' ability to recognize an emergency situation, whether they comprehend Isabella's medical history, ongoing medical needs and whether they would oppose the recommendation of a medical professional at the detriment of their daughter's health." The social worker was also uncertain about whether the parents were comprehending all of the medical information that had been imparted to them or the techniques they had been shown for interacting with and soothing Isabella.

An adoption assessment had been completed and Isabella was found adoptable, but the social worker noted that adoption was not the appropriate plan at that time, given the parents' active involvement in reunification services. The social worker

recommended that the juvenile court continue family reunification services until the 18-month hearing.

On October 25, 2012, the juvenile court found that the parents had made substantial progress toward alleviating or mitigating the causes necessitating placement and therefore continued reunification services pending the 18-month review hearing, scheduled for November 27, with the goal of placement in an "identified placement" on November 28.

In a status review report filed on November 20, 2012, the social worker related that the parents had been actively working on their case plan and visiting with Isabella almost daily. She recommended that dependency be maintained and that the parents receive an additional six months of reunification services. She expected that Isabella could be returned to the parents within the following 60 to 90 days, depending on the transition, and requested discretion to begin a trial visit with the parents in early February.

In an interim review report filed on January 8, 2013, the social worker recommended that reunification services be terminated as to both parents and that a section 366.26 hearing be set. She related that, early on the morning of January 2, the foster mother had informed her that, as she was preparing Isabella for a visit with the parents, she noticed five dark two-inch scratches on Isabella's right shoulder. Isabella had had a visit with her parents the previous day and, when they dropped her off after the visit, they did not mention that she had sustained an injury while in their care.

The social worker cancelled that day's planned visit with the parents and reported the suspected child abuse incident for investigation. Later that morning, after the parents were told that the visit was cancelled, the social worker received an email from petitioner to let her know that, on the previous day, as he was blow drying Isabella's hair after a bath, she "got startled, did a sudden movement backwards, and burned herself on the blow dryer." Petitioner indicated that he thought the burn was barely noticeable and not

8

serious, but had put antibiotic ointment on it. The social worker then called petitioner, who could not explain why he did not inform the foster parents about the burn or suggest they put cream on it. He seemed to minimize the situation, which illustrated to the social worker that the parents were not equipped to safely parent Isabella. It raised "a concern about their ability to recognize and appropriately react to a serious situation, which was a concern early on in the case. There was an occasion when Isabella's eyes rolled to the back of her head when she was in her crib and the father reports he noticed it but left and went to work instead of reacting to it."

An Agency emergency response investigator interviewed the parents separately. Mother said she had been holding Isabella while petitioner blew dry her hair and Isabella had not cried; mother was unaware that Isabella had been burned. In his interview, petitioner said Isabella had jerked backwards and hit the blow dryer, which caused her to scream. When the investigator asked to see the blow dryer, petitioner said he had thrown it away because it was dangerous. When asked to retrieve the blow dryer from the garbage, he said the garbage had already been picked up by the city. The social worker later discovered that in fact the garbage had not yet been picked up at that time. The investigator described the parents' versions of what had happened as "inconsistent and concerning," and she therefore referred the matter to the Fremont Police Department.

In an addendum report filed on February 20, 2013, the social worker related that mother had moved out of the home she shared with petitioner, reportedly due to the burn incident. Following the investigation of that incident, the emergency response worker deemed her investigation "inconclusive," but the risk assessment score was high and the emergency response worker recommended that Isabella remain in protective custody with supervised parental visitation only. The social worker continued to recommend that reunification services be terminated as to both parents and that a section 366.26 hearing be set.

9

The contested 18-month review hearing began on March 8, 2013. Mother testified about the many things she had learned to enable her to care for Isabella, such as changing her bandages, bathing her, administering medication, blending her food and feeding her, as well as ordering her medications and supplies. Mother further testified that she did not learn about Isabella's burn from the blow dryer until the day after it occurred. While petitioner was blow drying Isabella's hair, she was holding Isabella, and nothing out of the ordinary happened. Isabella cried on and off due to discomfort with the blow drying, but nothing beyond that. Isabella was not crying when petitioner turned the blow dryer off. Mother did not see petitioner put burn ointment on Isabella's shoulder.

At the April 12, 2013 continued 18-month hearing, mother testified that she first learned about Isabella's burn from the social worker and her lawyer on the day after it occurred. When asked whether she had concerns about Isabella's safety with petitioner, she responded, "I honestly don't know if my daughter is safe with him or not, because it—it's just—I know he's a good father, but then about the hair dryer incident, that—that really concerned me. So it's—I have a 50-50 comment towards that [¶] . . . situation." She confirmed again that she was present when petitioner blew dry Isabella's hair on the day she was burned, and had no knowledge of petitioner blow drying her hair a second time later that day.

Subsequently, when petitioner was called to testify, he exercised his Fifth Amendment right to remain silent. The court and counsel discussed the possibility of granting petitioner immunity pursuant to section 355.1, and the court requested that the attorneys further research the question and report back.

In an addendum report filed on April 19, 2013, the social worker related that mother had filed for a temporary restraining order (TRO) against petitioner.[4] The social worker had met with mother, who said that petitioner had been controlling and verbally

---

[4]At the start of the April 12 hearing, petitioner and mother had stipulated to the juvenile court's issuance of a three-year restraining order against petitioner.

and emotionally abusive since the start of their relationship four years earlier. She also said that, on Christmas evening, petitioner became physically abusive, grabbing her by the neck and attempting to choke her. The next day, he told her that he had no memory of the attack. Shortly after the burn incident, in early January, petitioner began hitting mother in the car while she was driving. Once she pulled into a parking lot, he continued to repeatedly hit her. When the social worker asked about what could have triggered this violence, mother replied that "the stress of the trial was wreaking havoc on [petitioner's] mental and emotional state and . . . he blamed her for the toll that it was taking on him." A third violent incident took place on March 10, after petitioner arrived unannounced at mother's workplace, demanding to know why she had not answered his text and voicemail messages. He took her keys and waited in her car until she finished work. Once she was in the car, petitioner began hitting her arms, chest, and face. After that incident, she filed for a TRO against petitioner.

Finally, the social worker reported that mother was in agreement with the Agency's recommendation for termination of reunification services and the setting of a section 366.26 hearing because, although "she loves Isabella, she wants her child in a two parent home where she will be safe and void of violence and manipulation."

In an addendum report filed on July 17, 2013, the social worker related that the parents were separately attending weekly supervised visits with Isabella; they also continued to participate in individual therapy. Isabella had now been diagnosed with spastic quadriparetic cerebral palsy. The social worker continued to recommend that reunification services be terminated and that a section 366.26 hearing be set.

The 18-month review hearing resumed on July 19, 2013. Christina Bolts, the social worker assigned to the case, testified that it was still uncertain whether Isabella's initial injuries were intentionally or accidentally inflicted. With respect to the blow dryer burn, Bolts believed the burn was a "serious concern" because petitioner did not tell the

11

foster mother about it when he dropped Isabella off at her home that night. Nor did he notify the social worker or anyone else about the burn until the next day.

Bolts' changed opinion regarding whether Isabella should be returned to petitioner's custody was based approximately 40 percent on the blow dryer burn. After that incident, she reviewed the history of the case and became concerned about how, at the beginning of the case, petitioner had noticed Isabella's eyes rolling back, but went to work anyway. She also found mother's recent allegations of domestic violence by petitioner to be of significant concern. She was troubled by the unaddressed domestic violence, which reflected petitioner's unpredictable behavior and impatience. Isabella was a medically fragile child who needed someone who would be patient, attentive, and consistent. Bolts acknowledged that she had not referred petitioner to domestic violence or anger management classes.

In an addendum report filed on October 28, 2013, Bolts reported that petitioner had been described, during his supervised visits, as "attentive, loving, engaging and responsive to all Isabella's verbal and nonverbal cues and her physical needs." Petitioner had also attended approximately 14 domestic violence classes since September. Bolts continued to recommend that reunification services be terminated and that a section 366.26 hearing be set.

Also on October 28, 2013, at the continued 18-month review hearing, Bolts testified that the Agency had recommended, in October 2012, that Isabella be transitioned into her parents care because the parents were working on their case plans. They were visiting, attending individual therapy, and meeting with the parent/child therapist. The Agency, however, still had concerns about the parents at that time, primarily regarding how they would handle a crisis situation. This concern stemmed from the parents' objections to a number of surgical procedures over the course of two years. The unanswered question was whether, in a crisis, petitioner was "going to be able to rise to the occasion and do what was necessary for Isabella, instead of doing what was in his

12

best interests?" The Agency had also been concerned about the parents' apparent inability to process information from the various medical appointments they had attended. Petitioner often brought up the same nitpicking issues repeatedly with medical providers and it was a concern that there "seemed to be a pattern of him focusing on petty matters instead of larger issues."

Then, after Isabella suffered a second degree burn while in her parents' care, the Agency changed its recommendation for reunification based on petitioner's failure to tell mother, the foster parents, Bolts, or Isabella's doctor about the burn. This demonstrated his inability to handle a crisis situation in the moment, and the Agency decided that day to change the recommendation to termination. That petitioner also threw away the blow dryer and falsely said that the trash had already been picked up presented additional concerns.[5]

On December 16, 2013, at the continued 18-month hearing, Bolts testified in more detail about the circumstances surrounding Isabella's burn from a blow dryer, and concluded that all of petitioner's actions related to that incident reflected an attempt to hide the burn from everyone. It worried her that he could not be honest with the Agency, or even with mother, and she reiterated her concern about how he would handle an even more serious crisis situation. She was also concerned about petitioner blow drying the hair of a medically fragile child who arches her back. Finally, it was striking to Bolts that petitioner waited until the next day to notify her about the burn, given that he was always vigilant in communicating with her about the various injuries he would notice on Isabella that he believed she had suffered while with her foster family. For example, he had

---

[5]Bolts stated that, had a forensic child abuse expert been able to examine the blow dryer, she could have determined whether the blow dryer was defective or whether the burn was non-accidental. The police officer in charge of the criminal investigation had also said that she was unable to conduct a thorough investigation because of the disposal of the blow dryer.

13

gotten angry when Bolts disregarded his insistence that Isabella be taken to the hospital after he noticed she had a scratch on her forehead.

As to why the Agency changed its recommendation regarding Isabella's return to petitioner's custody, Bolts reiterated that, while the burn incident comprised 40 percent of the reason for the changed recommendation, the other 60 percent was based primarily on petitioner's earlier objections to the G-tube surgeries, his attempt to blame the foster mother by continuing to focus on a rash Isabella had contracted, and his "repeated asking of questions of the medical professionals and almost expecting a different answer, instead of focusing on what was currently happening with Isabella."

Regarding Isabella's surgeries, Bolts testified that, in 2012, the NG-tube, which went down her nose and into her stomach, had become intolerable to Isabella, and she was in pain and crying as a result. Bolts had informed petitioner about the discomfort the NG-tube was causing. At meetings with the doctors, Bolts observed him "asking the same question over and over again." When he was given information that he seemed to dislike, he would ask the question again, as if he expected a different response. Before the second G-tube surgery, when Isabella had not eaten in 10 hours and was in pain, the parents refused to consent to the surgery unless it took place at Stanford Hospital, which was not a realistic option given the urgent timeframe. The parents appeared unable to comprehend that the surgery had to take place immediately. Bolts therefore had to submit an ex parte request to the court so that the surgery could go forward.

Bolts also testified that, over the previous three months, she had been unable to meet with petitioner because he had not made himself available to her, which had hindered her ability to work with him.[6]

---

[6]Bolts later testified that, during a break in the proceedings, she had met with petitioner and his attorney, and learned that he had attended nearly all of Isabella's recent doctor appointments and was aware of her current medical situation.

14

Petitioner was called as a witness, and he again refused to answer questions based on his Fifth Amendment privilege against self-incrimination.

Diane Fisher, a public health nurse with the Agency, testified that she became involved in this case in August 2011. Since November 2011, she had been meeting with Isabella's biological and foster families to educate them about health issues and had also accompanied them to medical appointments. She had met with petitioner the previous month about a recent incident that occurred during a visit. He was feeding Isabella through her G-tube and he ran her feeding prompt at a higher speed than that currently prescribed by her doctor, and also interrupted the feeding several times, all of which could cause physical harm to Isabella. During the discussion with petitioner about this incident, he did not make eye contact or say much, and he appeared "kind of angry."

Fisher also testified about the history of Isabella's NG-tube and G-tube issues and surgeries, and the parents' concerns and actions related to those issues. Isabella had had a permanent "14 French Mickey G-tube" connected to her stomach for feeding since the August 3, 2012 surgery, which had been a success in that Isabella had gained weight and was now well-nourished. She was fed through the G-tube for an hour and a half, five times a day, as well as for seven hours overnight.

Fisher described Isabella's medical condition, which included static encephalopathy, meaning she had brain damage that would cause cognitive impairment and reliance on caregivers for the rest of her life. She may continue to need regular G-tube feedings, would require several surgeries—to her legs, spine, and hip—and would continue to have cortical vision impairment. She would also continue to need to see various doctors regularly, and would require regular physical, speech, and occupational therapy.

In response to a question regarding whether she had concerns about petitioner having custody of Isabella, Fisher said she did, explaining: "So one of my concerns is . . . whether the father has the ability to understand the . . . medical professionals,

15

because he—on multiple occasions I've heard him ask questions of the doctors and get an answer to those questions, and then yet, at the next appointment, he brings up those very same questions again, as though the questions were never answered in the first place. [¶]. . . . [¶] So I have concerns about his ability to understand the medical information he's being given." Fisher also expressed concern that petitioner did not seek immediate medical attention after Isabella was burned by the blow dryer.

Fisher acknowledged that Dr. Crawford, a child abuse expert, had opined, based on his review of the medical records, that it was possible that, if Isabella's parents had no experience with seizures, they might not have initially recognized that she was having seizures. Dr. Crawford also believed it likely that Isabella's leg was broken while she was hospitalized after the brain injury. But he also said he could not rule out the possibility—which another doctor who had reviewed Isabella's case had theorized—that the injury was a reinjury of an old fracture. Dr. Crawford had indicated that he could not say whether or not Isabella's injuries had been caused by non-accidental trauma.

Finally, Estelita Reyes, a relative of petitioner's who was a certified nurse's assistant, testified that, if petitioner were given custody of Isabella, they could live with her and she would assist in caring for Isabella.

On January 23, 2014, at the conclusion of the 18-month review hearing, the juvenile court ruled as follows: "Isabella is an extremely, medically fragile child. The record in this case is replete [with] examples of the parents making poor decisions in dealing with her medical condition, and frankly, using bad judgment in dealing with her condition and with other events that have occurred while she's been under this Court's jurisdiction. [¶] Their decisions have caused delay in her treatment and have prolonged pain, and frankly, put her in jeopardy. Hesitation and second-guessing in a case such as this, with a medically fragile child, is damaging and potentially fatal to the child." The court then cited three examples of the parents' poor judgment, including (1) the parents' refusal, in May 2012, to consent to surgery for Isabella to insert a G-tube even though

16

they had received information about the harm the then-present NG-tube was causing her, and the court's need to authorize the surgery; (2) the parents' subsequent refusal, in August 2012, to consent to surgery for placement of a larger G-tube, which required the court to authorize the surgery under emergency circumstances; and (3) the burn incident in January 2013, which involved "a monumental display of poor judgment" on the part of both parents, particularly petitioner, whose actions gave the appearance of trying to hide something.

The court continued: "All the evidence in this case regarding the father's judgment, in particular, and decision making, points to an inability of the father to provide for the safety of this medically fragile child." The court also found that there was no evidence that petitioner had a plan of care for Isabella or the ability to care for Isabella in her current condition.

The court found that reasonable services had been provided and further found, by a preponderance of the evidence, that, although the "extent of progress" by both parents had been "substantial," return of Isabella to the custody of either parent and, in particular, petitioner, would create a substantial risk of detriment to her safety, protection, or physical or emotional well-being. The court therefore terminated reunification services as to both parents and set the matter for a section 366.26 hearing.

On January 27, 2014, petitioner filed this petition for extraordinary writ seeking review of the juvenile court's order.[7] On April 10, 2014, we ordered the proceedings in the juvenile court temporarily stayed, pending determination of the petition.

### DISCUSSION

Petitioner contends substantial evidence does not support the juvenile court's finding that return of Isabella to his custody would create a substantial risk of detriment to Isabella's physical or emotional well-being.

---

[7]Mother is not a party to this writ petition.

17

Section 366.22, subdivision (a), directs that, if the juvenile court finds, by a preponderance of the evidence, that return of a child to his or her parent "would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child," the court must terminate reunification services and hold a section 366.26 hearing within 18 months after the date the child was removed from the parent's physical custody, upon a finding that reasonable services were offered or provided.  This "substantial detriment" standard " 'must be construed as a fairly high one.  It cannot mean merely that the parent in question is less than ideal, did not benefit from the reunification services as much as we might have hoped, or seems less capable than an available foster parent or other family member.'  It must mean what it says:  that return presents a *substantial* risk of detriment to the child." (*Rita L. v. Superior Court* (2005) 128 Cal.App.4th 495, 505.)

Our review of the juvenile court's finding of detriment involves reviewing the record to determine whether there is substantial evidence to support the finding.  (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 763.)

Petitioner argues that the record shows that he fully complied with the requirements of his case plan and, therefore, the juvenile court's detriment finding was not supported by substantial evidence.  The appellate court in *In re Dustin R.* (1997) 54 Cal.App.4th 1131, 1143 rejected a similar argument, explaining that "simply complying with the reunification plan by attending the required therapy sessions and visiting the children is to be considered by the court; but it is not determinative.  The court must also consider the parents' progress and their capacity to meet the objectives of the plan; otherwise the reasons for removing the children out-of-home will not have been ameliorated."

Here, we conclude that substantial evidence supports the court's finding that petitioner did not demonstrate his capacity to meet the objectives of his case plan.  (See *In re Dustin R.*, *supra*, 54 Cal.App.4th at p. 1143.)  The case plan included the following

18

"client responsibilities" for petitioner: attending general counseling, participating in a psychiatric/psychological evaluation, attending a parenting education program, and providing medical consent. The evidence shows that petitioner had regularly participated in individual therapy, had completed a psychological evaluation and a parenting class, had attended Isabella's medical appointments, and was participating in infant/parent therapy. In addition, there was at least some evidence that, after resisting and delaying needed medical interventions for Isabella, he had begun to learn to provide medical consent.

The evidence also shows, however, that petitioner did not satisfy several of the most important *objectives* of his case plan, which included showing his "ability and willingness to have custody of" Isabella, showing his "ability to provide adequate care for [her] special needs," and showing that he accepted responsibility for his actions. For example, in the October 16, 2012 report for the 12-month review hearing, the social worker reported that, while the parents had "tackled their case plan objectives with relative ease over the reporting period," the social worker's "outstanding concerns revolve[d] around the parents' ability to recognize an emergency situation, whether they comprehend Isabella's medical history, ongoing medical needs and whether they would oppose the recommendation of a medical professional [to] the detriment of their daughter's health."

As late as November 20, 2012, only two or three months before the Agency hoped to transition Isabella into the parents' custody, the social worker had reported that, "[e]ven though the parents have made progress in their case plan, there are still many issues that need to be addressed before Isabella can be safely returned to the parents['] care. Just a few short weeks ago, the parents failed to feed Isabella properly as they felt they were too busy attending appointments. Isabella went for approximately 4 hours without being fed properly." Nor had the parents yet demonstrated that they could administer Isabella's medications, give her a bath, or clean and change her daily bandage.

19

The social worker expressed the need for a "thoughtful, careful, and lengthy transition," given the fact that Isabella's "special needs are numerous, time consuming, and overwhelming," and that failure to grasp and execute all the necessary practices could lead to "devastating results" for Isabella.[8]

All of these concerns reflect the fact that, even after some 13 months of reunification services, petitioner still had not satisfied the case plan objectives of showing his ability to both have custody of Isabella and provide adequate care for her special needs. Indeed, in finding a substantial risk of detriment, the juvenile court stated, inter alia, that there was no evidence that petitioner had a plan of care for Isabella or the ability to care for her in her current condition. (See *In re Dustin R.*, *supra*, 54 Cal.App.4th at p. 1143.)[9]

The circumstances surrounding Isabella's blow dryer burn, which occurred on January 1, 2013, during an unsupervised visit with petitioner and mother, provides additional persuasive evidence to support the juvenile court's finding that Isabella could not be safely returned to petitioner's custody. The social worker noted that this issue related back to an event that had led to Isabella's dependency: when her eyes had rolled to the back of her head while she was in her crib and petitioner said he had "noticed it but left and went to work instead of reacting to it." Moreover, regardless of whether

---

[8]The social worker described Isabella's daily life: "She is taking six medications which need to be administered through the G tube up to 4 times a day. She is fed at least 5 times daily by the G tube. She has anywhere between 4-6 appointments a week. She wakes up 3-4 times nightly. She is bathed in a specialized tub, and requires special bandages which need to be cleaned and reapplied."

[9]We find unpersuasive petitioner's argument that he was held to a double standard compared to the foster mother, whose alleged misdeeds "went essentially unquestioned by the social worker." He argues that his inadvertent mistakes, such as burning Isabella with a blow dryer, were criminalized while the foster mother's accidental acts, such as inflicting gashes, bruises, scratches, rashes, and more on Isabella, went unremarked. This argument is so ludicrous as to not warrant discussion other than to note that the sole question at issue here is whether petitioner is able to safely parent Isabella.

Isabella's initial injuries, including her brain damage and broken leg, resulted from abuse or other causes and, regardless of whether the burn was intentionally or accidentally inflicted, the social worker was understandably worried about petitioner's ability to be honest with the Agency and about how he would handle an even more serious crisis situation. Fisher, the public health nurse, also was concerned about petitioner's failure to seek medical attention immediately after Isabella was burned. As the juvenile court found, petitioner's failure to inform anyone about the burn until the following day and other secretive behavior, including the disposal of the blow dryer, reflected "a monumental display of poor judgment."[10]

Thus, the burn incident and its aftermath provide additional evidence of petitioner's failure to meet his case plan objectives. It not only reflects his inability to have custody of Isabella and to provide adequate care for her special needs but also reflects his failure to demonstrate that he has satisfied the case plan objective of accepting responsibility for his actions. (See *In re Dustin R.*, *supra*, 54 Cal.App.4th at p. 1143.)[11]

---

[10]The court also cited the parents' refusal to consent to either the first G-tube surgery even after they were informed about the harm the NG-tube was causing her, or the emergency G-tube surgery that was later necessary, as additional examples of their poor judgment.

[11]*In re Joseph B.* (1996) 42 Cal.App.4th 890, 902, relied on by petitioner, is inapposite. Petitioner cites the *Joseph B.* court's quotation of a statement in *In re Venita L.* (1987) 191 Cal.App.3d 1229, 1242, disapproved on another ground in *In re Jasmon O.* (1994) 8 Cal.4th 398, 421, fn. 3, regarding the need for a juvenile court to determine whether any new problems with the parent are a manifestation of the original basis for the dependency and, if not, whether the new problem would sustain a jurisdictional finding. Petitioner apparently cites these cases in an attempt to bolster his argument that the blow dryer incident was neither a new problem that would sustain a jurisdictional finding, nor a manifestation of the original basis for dependency. As already discussed in detail, however, the detriment found by the juvenile court in this case is rooted in petitioner's failure to satisfy his case plan objectives, and substantial evidence supports that finding.

Petitioner's reliance on *David B. v. Superior Court* (2004) 123 Cal.App.4th 768 is likewise misplaced. There, the appellate court criticized the juvenile court for focusing on insignificant details regarding the father's parenting abilities, rather than on whether the child's "safety, protection, or physical or emotional well-being would be placed at

21

In sum, although the evidence shows that petitioner plainly did work hard to satisfy the requirements of his case plan and to learn to care effectively for his daughter, the evidence also shows that petitioner did not satisfy his case plan objectives, in that he did not demonstrate the ability to provide adequate care to Isabella, given her medical fragility and many special needs, or to accept responsibility for his actions, which is essential to parenting a medically fragile child who is likely to face repeated medical crises. Hence, substantial evidence supports the juvenile court's determination, by a preponderance of the evidence, that Isabella would suffer a substantial risk of detriment to her well-being if she were returned to petitioner's custody. (See *Angela S. v. Superior Court*, *supra*, 36 Cal.App.4th at p. 763; see also § 366.22, subd. (a).)[12]

### DISPOSITION

The petition for extraordinary writ is denied on the merits. Our decision is final as to this court immediately (rule 8.490(b)(2)(A)), and the stay imposed is hereby lifted.

---

substantial risk in [the father's] care." (*Id*. at p. 790.) Unlike *In re David B*., this case involves much more than minor flaws in parenting styles and, as already discussed, a finding that petitioner is unable to safely parent his child for a number of reasons.

[12]We note that the petition contains a vague argument related to petitioner's Fifth Amendment rights and use immunity, the purpose of which is not clear. Citing section 355.1, subdivision (f), and rule 5.548, petitioner states: "[I]f the Department seeks to compel father to testify to information, or particular questions, which could be subsequently used in a criminal prosecution and would effectively contravene father's 5th Amendment rights, which the department had proffered as a possibility, father would request that the Department make a [rule] 5.548 request to provide use and derivative use immunity . . . ." Petitioner has not shown how this argument is relevant to the question we address here: whether substantial evidence supported the juvenile court's detriment finding. Hence, we will not address it.

_____
Kline, P.J.

We concur:


_____
Richman, J.


_____
Brick, J*


* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.